IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

ANDRE CLARK,

                              Plaintiff,                    Civil Action No.
                                                           9:15-CV-00304 (GTS/DEP)

        v.

T. BELL, *et al.*,

                              Defendants.
_____

APPEARANCES:                                          OF COUNSEL:

FOR PLAINTIFF:

ANDRE CLARK, *Pro Se*
12-A-2949
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN                    KEVIN M. HAYDEN, ESQ.
New York State Attorney General             Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

        *Pro se* plaintiff Andre Clark, a prison inmate currently being held in the

custody of the New York State Department of Corrections and Community

Supervision ("DOCCS"), has commenced this action pursuant to 42 U.S.C. § 1983, alleging that various employees of the DOCCS deprived him of his civil rights. Generally speaking, plaintiff's complaint alleges that he was assaulted by corrections officers, falsely charged with possessing contraband, and denied a proper disciplinary hearing in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Currently pending before the court is a motion by the defendants for summary judgment, seeking dismissal of plaintiff's complaint for failure to exhaust his administrative remedies. Based upon the record now before the court, I recommend that defendants' motion be granted, and that plaintiff's complaint be dismissed.

I.    BACKGROUND[1]

Plaintiff is a prison inmate currently incarcerated at the Clinton Correctional Facility ("Clinton"), a DOCCS prison facility located in Dannemora, New York. *See* Dkt. No. 19-3 at 2.[2] All claims in this action

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). Because only plaintiff's Eighth Amendment claim remains in the case, I will recount only the pertinent facts giving rise to that claim, and specifically will not include references to the various other claims already dismissed by Chief District Judge Glenn T. Suddaby. *See* Dkt. No. 7.

[2]    By virtue of plaintiff's failure to respond to defendants' motion, many if not most of

arose on or around December 3, 2014, while plaintiff was confined at the Riverview Correctional Facility ("Riverview"), another DOCCS prison facility. Dkt. No. 1.

In his complaint, plaintiff alleges that while he was in Block E-2 at Riverview, he was suspected by corrections officers of possessing contraband. *Id.* Based on that suspicion, Corrections Officer T. Bell, a defendant in this case, conducted a pat frisk of the plaintiff. Dkt. No. 19-4 at 22-26. According to plaintiff, defendant Bell almost "immediately" after beginning the pat frisk asked plaintiff if he had anything in his mouth. *Id.* at 25-26. After plaintiff responded that he did not, defendant Bell attempted to manually open plaintiff's mouth, and thereafter punched him in the face. *Id.* Plaintiff alleges that he was then severely beaten by defendant Bell, who was joined by Corrections Officers T. Mackay and D. Middlemiss, and Corrections Sergeants Duvall and Sovie. *Id.* at 29-39; *see also* Dkt. No. 1 at 3. Plaintiff alleges that, as a result of the assault, he suffered "a hair line [sic] fractured jaw and very bruised up body and face." Dkt. No. 1 at 3.

Plaintiff admits in his complaint that he never filed a grievance regarding this incident. Dkt. No. 1 at 3. He states, however, that he did not do so because he was threatened by defendant Bell that "if [he] grieved this

---

the pertinent facts are derived from defendants' Rule 7.1 Statement and are deemed to be admitted. *See* N.D.N.Y.L.R. 7.1(a)(3).

incident, [he] would be killed." *Id.* Plaintiff later effectively recanted this allegation during his deposition, however, and instead testified that no one ever threatened to harm him if he filed a grievance, and admitted that the statement in his complaint concerning defendant Bell threatening to kill him if he filed a grievance was false. Dkt. No. 19-4 at 56, 59.

II.    <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on March 17, 2015. Dkt. No. 1. As defendants, plaintiff's complaint named Riverview Superintendent Radsatt, Captain R. Adams, Nurse J. Robinson, Corrections Officers T. Bell, D. Middlemiss, and T. Mackay, and Corrections Sergeants Duvall and Sovie. *Id.* On July 1, 2015, Chief District Judge Glenn T. Suddaby issued a decision and order granting plaintiff's motion to proceed *in forma pauperis*, and dismissing all of plaintiff's claims *sua sponte* pursuant to 28 U.S.C. §§ 1915(e) and 1915A, with the exception of plaintiff's Eighth Amendment claim of excessive force asserted against defendants Bell, Mackay, Middlemiss, Duvall, and Sovie. Dkt. No. 7.

On April 18, 2016, defendants moved for summary judgment dismissing plaintiff's complaint. Dkt. No. 19. In their motion, defendants argue that plaintiff's remaining claim is procedurally barred by virtue of his failure to exhaust his available administrative remedies. Dkt. No. 19-11 at 4.

Despite having been served with the requisite notification of the

4

consequences of failing to respond, Dkt. No. 20, plaintiff has filed no opposition to defendants' motion. That motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation to the assigned district judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

B.    Plaintiff's Failure to Oppose Defendants' Motion

Before turning to the merits of defendants' exhaustion defense, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiff's complaint.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment

motions. *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with Local Rule 7.1(b)(3). *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.); *Henry v. Dinelle, et al.*, 10-CV-0456, 2011 WL 5975027, *10 (N.D.N.Y. Nov. 29, 2011) (quoting *Xu-Shen Zhou v. S.U.N.Y. Inst. of Tech.*, 08-CV-0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sep. 14, 2011), *vacated in part on other grounds by* 499 F. App'x 105 (2d Cir. Oct. 10, 2012)).

It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged,

thus permitting the court to deem these facts to have been admitted.[3] *See*

*Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1

(N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan*

*v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000)

(discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' motion, I

recommend that the court review the motion for facial sufficiency, accepting

defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3)

Statement as uncontroverted to the extent they are supported by accurate

record citations, and that the motion be granted if determined to be facially

meritorious.

C.    Failure to Exhaust Available Administrative Remedies

1.    Controlling Legal Principles

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No.

104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the

ability of prisoners to maintain federal civil rights actions, expressly requires

that "[n]o action shall be brought with respect to prison conditions under

section 1983 of this title, or any other Federal law, by a prisoner confined in

any jail, prison, or other correctional facility until such administrative

---

[3]    Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *See* N.D.N.Y.L.R. 7.1(a)(3)(emphasis in original).

remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

At the time defendants filed their motion, the law within this circuit

required an analysis pursuant to a three-part test for determining whether dismissal of an inmate plaintiff's complaint was warranted for failure to satisfy the PLRA's exhaustion requirement. *See Macias*, 495 F.3d at 41-42; *Hemphill v. New York*, 380 F.3d 680, 688-89 (2d Cir. 2004). That test has been articulated by the Second Circuit as follows:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact available to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

*Hemphill*, 380 F.3d at 686. Since *Hemphill* and its companion cases were decided, the "special circumstances" exception to the exhaustion requirement has been rejected by the Supreme Court.[4] *See Ross v. Blake,* 136 S.Ct. 1850, 1858 (2016). Whether non-exhaustion is excusable now

---

[4]    *Hemphill* was decided in 2004 as one of the several cases addressing exhaustion. The other companion cases were *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004); and *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004).

exclusively "hinges on the 'availab[ility]' of administrative remedies." *Id.*

The Supreme Court has identified three circumstances in which administrative remedies may be "unavailable." *Id.* at 1859-1860. First, administrative procedures are unavailable when they "operate[] as a simple dead end – with officers unable or consistently unwilling to provide any relief[.]" *Id.* at 1859. Second, they are unavailable when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, they are unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." *Id.* at 1860.

 2.  Analysis

The DOCCS has instituted a grievance procedure, entitled the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* Representatives of the facility's inmate grievance resolution committee

("IGRC") have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[5] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be rendered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can – and must – be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer*, No.

---

[5]     Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(3)(i), (ii).

03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

Plaintiff is not unfamiliar with the IGP. Indeed, on December 2, 2014, the day before the alleged assault, he filed a grievance regarding a threat allegedly made by a corrections officer, although that grievance was not pursued to completion before the CORC. Dkt. No. 19-2 at 1-2. Plaintiff admits that he did not file a grievance with respect to the assault that occurred on December 3, 2014. Dkt. No. 1 at 4. While he did offer an excuse for his non-exhaustion in his complaint – alleging that defendant Bell would kill him if he filed a grievance – plaintiff subsequently admitted in his deposition that this statement was untrue.[6] Dkt. No. 19-4 at 56, 59.

---

[6] At plaintiff's deposition the following exchange occurred: Q: Did he ever threaten you with respect to filing grievances? A: No. Q: Okay. Did any officer ever threaten you –

Based on this admission, and the plaintiff's failure to oppose the defendants' Rule 7.1(a) Statement, the court rejects as untrue plaintiff's statement in his complaint that defendant Bell threatened to kill him if he filed a grievance, and declines to consider this allegation as evidentiary proof regarding the unavailability of a grievance procedure.[7] *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact."); *Aziz Zarif Shabazz v. Pico,* 994 F. Supp. 460, 470 (S.D.N.Y. 1998) ("[W]hen the facts alleged are so contradictory that no doubt is cast upon their plausibility, [the court is] authorized to 'pierce the veil of the complaint's factual allegations,' dispose of '[s]ome improbable allegations', and dismiss the claim."); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming summary judgment where the "District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony" which no reasonable person could believe); *Fant v. Columbia University*, 97-cv-7619, 1999 WL 232699, *3 n.2 (S.D.N.Y. Apr. 21, 1999) (disregarding allegation in complaint that was "contradicted by plaintiff's own deposition testimony and the EEOC charge

---

A: No. Q: --well about filing a grievance? A: No, sir. Dkt. No. 19-4 at 56.

[7]    Having declined to consider the admitted untrue statement in plaintiff's complaint that defendant Bell threatened to kill him if he filed a grievance, the court need not decide whether such a threat might satisfy the standard of unavailability under *Ross v. Blake*.

itself").

I note that during his deposition, plaintiff made vague references to attempts to file a grievance regarding the alleged assault. Dkt. No. 19-4. While acknowledging that he did not immediately file a grievance "right then and there" due to a shortage of time, plaintiff claimed that he attempted to file a grievance directly to the facility Superintendent on December 8, 2014. Dkt. No. 19-2 at 2; Dkt. No. 19-4 at 51-53. Plaintiff suggests that officers may have prevented his grievance from being filed, but could not identify the officers involved, and offered no further specifics. Dkt. No. 19-4 at 51, 56. Plaintiff does not possess a copy of the grievance, never followed up on it despite not receiving a response, and never appealed the matter to the CORC. *Id.* at 53-55; Dkt. No. 19-7 at 2. Under these circumstances, I conclude that plaintiff has failed to raise a genuine issue of material fact as to whether the IGP was unavailable to him.[8]

In sum, the undisputed record evidence before the court establishes that plaintiff failed to comply with the PLRA requirement that he exhaust available administrative remedies before filing this action. Moreover, based

---

[8]     In *Messa v. Goord*, the Second Circuit held that resolution of the exhaustion defense is a matter for the court. 652 F.3d 305, 310 (2d Cir. 2011). In the event of a finding that issues of fact persist precluding resolution of the defense on a motion for summary judgment, then the court must conduct an evidentiary hearing to resolve the disputed issues. *See White v. Clark*, 12-cv-0986, 2016 WL 1266957, at *2 (N.D.N.Y. Mar. 31, 2016) (Mordue, J.); *Nelson v. Plumley*, 12-cv-0422, 2014 WL 4659327, at *13 (N.D.N.Y. Aug. 13, 2014) (Peebles, M.J. *report and recommendation adopted by* McAvoy, J.).

on plaintiff's own deposition testimony and his failure to respond to defendants' motion for summary judgment, I cannot conclude that plaintiff's administrative remedies under the DOCCS IGP were unavailable to him with respect to the incident that is the subject of his Eighth Amendment claim. Accordingly, I recommend that defendants' motion for summary judgment be granted, and that plaintiff's remaining claim be dismissed on this procedural basis.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint alleges that defendants Bell, Mackay, Middlemiss, Duvall, and Sovie, the only remaining defendants in this action, subjected him to an excessive use of force, in violation of his Eighth Amendment rights. The record firmly establishes that plaintiff did not file a grievance with respect to this claim, and plaintiff has failed to offer any credible evidence showing that the DOCCS inmate grievance process was not available to him. Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 19), be GRANTED, and that plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     June 30, 2016
              Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

Cotto v. Senkowski, Not Reported in F.Supp. (1997)

1997 WL 665551

1997 WL 665551
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Marcus COTTO, Plaintiff,

v.

Daniel SENKOWSKI, Superintendent of
Clinton Annex; T.J. Howard, Hearing Officer;
J. Maggy, Sergeant; Byron Wind, Officer;
Barry Rock, Officer; and Philip Coombe,
Jr., Acting Commissioner, Defendants.

No. 95–CV–1733 (RSP/DNH).
|
Oct. 23, 1997.

**Attorneys and Law Firms**

Marcus Cotto, Plaintiff, pro se, Auburn Correctional
Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State
of New York, Attorney for Defendants, Albany, New
York, Darren O'Connor, Esq., Asst. Attorney General, of
Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

 **\*1** This matter comes to me following a report-
recommendation by Magistrate Judge David N. Hurd,
duly filed on the 29th of August, 1997. Following ten days
from the service thereof, the Clerk has sent me the entire
file, including any and all objections filed by the parties
herein.

In his *pro se* complaint, Cotto alleges that in August
1995, he and some other inmates were attacked while
incarcerated at Clinton Correctional Facility. Compl.,
Dkt. No. 1, ¶ 2. Cotto alleges that as a result of this
incident he was charged with engaging in violent conduct
and conduct which disturbed the order of the facility. *Id.*
Although Cotto was found guilty of these charges and
sentenced to a term of one year in the Special Housing
Unit and loss of six months good time, his sentence was
reversed on administrative appeal. *Id.* Cotto brought this
action pursuant to 42 U.S.C. § 1983, alleging various

violations of his rights under the Eighth and Fourteenth
Amendments. *Id.*

By motion filed March 3, 1997, defendants sought
summary judgment. Dkt. No. 17. Plaintiff filed no
papers in opposition to the motion. In his report-
recommendation, the magistrate judge recommended that
I grant defendants' motion pursuant to Local Rule 7.1(b)
(3), which provides that, absent a showing of good cause,
failure to respond to a motion shall be deemed consent to
the relief requested. Dkt. No. 19, at 2. Cotto has filed no
objections to the report-recommendation.

After careful review of all of the papers herein, including
the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby
approved, and it is further

ORDERED that defendants' motion for summary
judgement is GRANTED and the complaint against them
dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of
this order on the parties by regular mail.

IT IS SO ORDERED.

DAVID N. HURD, United States Magistrate Judge.

*REPORT–RECOMMENDATION*

This matter was referred to the undersigned by
the Honorable Rosemary S. Pooler, for Report–
Recommendation pursuant to the Local Rules of the
Northern District of New York.

Plaintiff commenced the above § 1983 action making
various allegations regarding violations of his civil
rights under the United States Constitution. Pursuant to
Fed.R.Civ.P. 56, the defendants have moved for summary
judgment alleging that there is no genuine issue as to any
material fact and that as a matter of law they are entitled
to judgment.

The defendants have filed a motion pursuant to
Fed.R.Civ.P. 56 granting summary judgment in favor
of the defendants on grounds including that there is

Cotto v. Senkowski, Not Reported in F.Supp. (1997)

1997 WL 665551

no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

 **\*2**  NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report–Recommendation, by regular mail, upon the parties to this action.

**All Citations**

Not Reported in F.Supp., 1997 WL 665551

---

  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  2

2000 WL 1264122
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lisa ELGAMIL, Plaintiff,

v.

SYRACUSE UNIVERSITY, Defendant.

No. 99-CV-611 NPMGLS.
|
Aug. 22, 2000.

**Attorneys and Law Firms**

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681 *et seq.* ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local
Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to
the record where those facts are established. A similar
obligation is imposed upon the non-movant who

> shall file a response to the [movant's]
> Statement of Material Facts. The non-
> movant's response shall mirror the
> movant's Statement of Material Facts

> by admitting and/or denying each of
> the movant's assertions in matching
> numbered paragraphs. Each denial
> shall set forth a specific citation to the
> record where the factual issue arises....
> *Any facts set forth in the [movant's]
> Statement of material Facts shall be
> deemed admitted unless specifically
> controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed
an eleven page, twenty-nine paragraph Statement of
Material Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of
law which failed to admit or deny the specific assertions
set forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here,
the opposing party has failed to comply with the Rule.
*See, e.g., Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-
Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999);
*Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185
F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy, Inc. v.
Stewart and Stevenson Operations, Inc.,* 1998 WL 903629,
at \*1 n. 1 (N.D.N.Y.1998); *Costello v.. Norton,* 1998 WL
743710, at \*1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien
& Gere Engineers, Inc.,* 1998 WL 566773, at \*1 n. 2
(N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

# BACKGROUND

**\*2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

**\*3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee, authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators;[3] as mentioned, Clawson, not Roopnarine, authored the exam question.

**\*4** Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for

this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

> [t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating.[4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts: 1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

### DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c).* When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must

be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*
Title IX provides, with certain exceptions not relevant here, that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, ——, 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive
Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which

is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his

sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at \*5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work

environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at \*6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d] the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999).

There is no serious contention that plaintiff can satisfy this requirement.

**\*9**  By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[8]  In any event, the adverse action which plaintiff claims to

be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[9]

CONCLUSION

**\*10**  For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1264122

Footnotes

1  Amended January 1, 1999.
2  Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.
3  Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence

in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

4    Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

5    In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, ——, 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

6    Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

7    As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

8    As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

9    Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

---

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 232699
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ronald P. FANT, Plaintiff,

v.

COLUMBIA UNIVERSITY, Columbia University–
Affiliation, Colleen Crooker, V.P. Human Resources,
Dr. James L. Curtis, Director, Defendants.

No. 97 CIV. 7619 MBM.
|
April 21, 1999.

**Attorneys and Law Firms**

Ronald P. Fant, Woodbridge, NJ, for Plaintiff Pro Se.

Paul T. Williams, Jr., Esq., Elizabeth A. Bousquette, Esq.,
Bryan Cave LLP, New York, for Defendants.

OPINION AND ORDER

MUKASEY, D.J.

**\*1** Plaintiff *pro se* Ronald P. Fant sues Columbia
University, Colleen Crooker and James L. Curtis, alleging
discrimination in violation of Title VII of the Civil Rights
Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Defendants move
for summary judgment pursuant to Fed.R.Civ.P. 56,
arguing (1) that plaintiff's suit is time-barred and (2) that
he cannot establish a *prima facie* case of discrimination
under Title VII. For the reasons stated below, I find that
plaintiff's suit is time-barred, and defendants' motion is
granted accordingly.

I.

The facts relevant to the present motion can be
stated briefly. Plaintiff, a resident of New Jersey,
worked from 1989 to 1996 as the business officer of
Columbia University's Community Support System Program
("CSS"), which provides services for mentally
disabled adults. (Pl. Dep. at 33, 37–40, 243)[1] Plaintiff's
years at CSS were punctuated by several incidents of
conflict between him and his supervisor, Dr. McWelling
Todman. (*E.g., id.* at 63, 79–80, 87–88, 94–95, 131–

34, 149, 164, 169, 170, 181–82, 215, 284–85; Todman
Aff. ¶ 5) In December 1995, while investigating alleged
mismanagement of CSS funds by plaintiff, Todman
discovered evidence that plaintiff had been charging
unauthorized personal calls to CSS. (Todman Aff.
¶¶ 10–13) After further investigation in April 1996,
plaintiff's supervisors asked Columbia University's Office
of Internal Audit to conduct its own investigation.
(Whitley Aff. ¶ 6) As a result of that investigation,
which determined that plaintiff had misappropriated
approximately $7000 (*id.* Ex. 1), plaintiff was suspended
without pay and ultimately, on June 10, 1996, was fired.
(Pl. Dep. at 231, 243; Dep. Exs. 32–33; Whitley Aff. ¶ 8)

In December 1996, it appears that plaintiff submitted a
letter to the New York State Division of Human Rights
("NYSDHR") alleging some form of discrimination.
The agency, however, declined to investigate plaintiff's
charges, explaining in a letter dated December 13, 1996
that "the matter of which you have complained of,
personality conflict, does not fall within the jurisdiction
of this Agency." (Bousquette Aff. Ex. 2) On May 16,
1997, plaintiff filed a written charge with the U.S.
Equal Employment Opportunity Commission ("EEOC"),
alleging "retaliation" and "harassment" that occurred
between October 1995 and June 1996. (Dep. Ex. 36; Pl.
Dep. at 281)[2] On June 20, 1997, the EEOC rejected
plaintiff's charge as untimely, and notified him of his
"right to sue." (Bousquette Aff. Ex. 3) This action
followed.

II.

Discrimination claims under Title VII must ordinarily
be "filed" with the EEOC within 180 days of the date
on which the "alleged unlawful employment practice
occurred." 42 U.S.C. § 2000e–5(e)(1); *see Ford v. Bernard
Fineson Dev. Ctr.,* 81 F.3d 304, 307 (2d Cir.1996).
However, if the claimant "initially instituted proceedings"
with a state or local agency authorized to grant relief from
the alleged discrimination, then the time period for filing
a claim with the EEOC is extended to 300 days from the
alleged unlawful act or 30 days from receipt of notice
that the state or local agency has terminated proceedings,
whichever date is earlier. *See* 42 U.S.C. § 2000e–5(e)(1); *see
also Ford,* 81 F.3d at 307; *Tadros v. Coleman,* 717 F.Supp.
996, 1006–07 (S.D.N . Y.1989) (stating that the time
period begins to run on the date a plaintiff has notice of the

defendant's allegedly discriminatory act), *aff'd,* 898 F.2d 10 (2d Cir.1990). This filing requirement is similar to a statute of limitations. Thus, failure to meet the applicable requirement, even by one day, bars a plaintiff from bringing an action in federal court unless the defendant waives the requirement or is estopped to assert it, or unless the limitations period was equitably tolled. *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 392–98 (1982); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996); *Tadros,* 717 F.Supp. at 1006.

**\*2** In the present case, both parties appear to believe that the 300–day time limitation applies. (*See, e.g.,* Def. Mem. at 11–12; Pl. Surreply at 1)[3] Nevertheless, there is reason to believe that one of the other two possible time periods applies. Plaintiff delivered a letter to the NYSDHR regarding alleged "personality conflict[s]," presumably referring to his conflicts with Todman, in December 1996. Because plaintiff's letter is not in the record, it is not clear whether he "instituted proceedings" with the NYSDHR within the meaning of 42 U.S.C. § 2000e–5(e)(1).[4] But either way, the 300–day time limitation would be inapplicable. If plaintiff did not institute proceedings with the NYSDHR, then he would have been required to file a charge with the EEOC within 180 days of the alleged discriminatory act; if he did, he would have been required to file the EEOC charge within 30 days of the NYSDHR's December 13, 1996 letter rejecting his complaints.

In any event, it is unnecessary to decide whether plaintiff "instituted proceedings" with the NYSDHR, because his suit is time-barred under any of the possible limitations periods. Plaintiff had notice of defendants' alleged discriminatory acts as early as October 1995, but in no event later than June 10, 1996, the date he was fired. Nevertheless, plaintiff did not file a charge with the EEOC until May 16, 1997. That date is more than 300 days after the latest possible date on which plaintiff had notice of defendants' allegedly discriminatory acts and more than 30 days after the NYSDHR's letter rejecting plaintiff's complaint. Thus, no matter which of the time limitations applies—whether 180 or 300 days from the discriminatory act or 30 days from termination of the state agency proceedings—plaintiff's suit is barred.

Notwithstanding these facts, plaintiff contends that his suit is timely either because (1) on or about November 13, 1996, he submitted a letter to the Office of Federal Contract Compliance Programs ("OFCCP") in

Washington, D.C.; or (2) on July 1, 1996, he "visited" the EEOC's New York office. (Pl. Surreply at 1–2; 9/30/98 Letter to the Court from Ronald P. Fant) These arguments are without merit.

First, plaintiff's letter to the OFCCP does not satisfy the requirement of filing a charge with the EEOC itself. In *Ford,* 81 F.3d at 306–12, the Second Circuit held that, under some circumstances, a plaintiff can satisfy the requirement of filing a charge with the EEOC by filing a charge with a state agency that has a work-sharing agreement with the EEOC pursuant to 42 U.S.C. § 2000e–8(b).[5] However, nothing in *Ford*—or any other case I have found—indicates that a plaintiff can satisfy Title VII's requirement of filing a charge with the EEOC by submitting a letter to a different federal agency. Moreover, even if the Second Circuit's reasoning in *Ford* could be applied to federal agencies, there is no indication here that the OFCCP has a work-sharing arrangement with the EEOC analogous to that involved in *Ford.* In fact, the OFCCP's reply letter to plaintiff explicitly states that it shares responsibility with the EEOC for enforcing Title I of the Americans with Disabilities Act; it says nothing about Title VII. (Exhibit to Pl. Surreply)[6]

**\*3** Nor does plaintiff's alleged visit to the EEOC in July 1996 satisfy the filing requirement. By its plain terms, Title VII requires that charges submitted to the EEOC in fulfillment of the filing requirement be in writing under oath or affirmation. *See* 42 U.S.C. § 2000e–5(b) ("Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the [EEOC] requires."). The only act that satisfied these requirements in this case was plaintiff's May 16, 1997 charge, which was not timely.

Because defendants are correct that plaintiff's suit is time-barred, it is unnecessary to consider their additional argument that he cannot establish a *prima facie* case of discrimination.

For the foregoing reasons, defendants' motion is granted, and plaintiff's complaint is dismissed.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 232699

Footnotes

1   "Pl. Dep." refers to the transcript of plaintiff's pretrial deposition, which was conducted on May 11, 1998. "Dep. Ex." refers to defense exhibits from that deposition. The transcript and the relevant exhibits are attached as Exhibits A and B, respectively, to the Affidavit of Elizabeth A. Bousquette.

2   In his complaint, plaintiff alleges that he filed the EEOC charge on April 17, 1997. (Compl.¶ 10) This allegation, however, is contradicted by plaintiff's own deposition testimony and the EEOC charge itself, both of which reflect the date May 16, 1997. (Pl. Dep. at 281; Dep. Ex. 36) Accordingly, I have disregarded this allegation in plaintiff's complaint.

3   "Pl. Surreply" refers to a document submitted by plaintiff titled "Addemdum [*sic*] to the Summary," dated September 23, 1998.

4   It can be inferred from the NYSDHR's reply letter, which is in the record, that plaintiff did not, in fact, "institute[ ] proceedings" with the agency. The NYSDHR informed plaintiff that it did not have jurisdiction over "personality conflict[s]," and instructed him "to file a complaint" if, after considering the applicable law, he felt he had been subject to actionable discrimination. (Bousquette Aff. Ex. 2)

5   Following *Ford,* several district courts have held that the existence of a work-sharing agreement between the EEOC and the NYSDHR automatically extends the time period for filing claims with the EEOC to 300 days, regardless of whether the claimant initially instituted a proceeding with the NYSDHR. *See, e.g., Morris v. Northrop Grumman Corp.,* ––– F.Supp.2d ––––, No. CV 95–3335 ADS, 1999 WL 79666, at *8–9 (E.D.N.Y. Feb. 17, 1999) (citing cases). In the present case, there is no evidence in the record indicating that the EEOC and the NYSDHR had a work-sharing agreement in place at the time plaintiff filed his charge. The issue is beside the point, however, because plaintiff did not file his charge even within 300 days.

6   It is not clear that plaintiff's letter to the OFCCP would constitute filing a charge in any event. The OFCCP neither processed plaintiff's letter nor forwarded it to another agency for processing. Rather, the agency notified plaintiff that he had not provided "sufficient information" for the agency to determine whether it could assist him, and directed him to file a formal complaint with the agency's New York office if he believed he had been discriminated against on the basis of any laws administered by the agency. (Exhibit to Pl. Surreply)

**End of Document**                                                                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by  Hartry v. County of Suffolk,  E.D.N.Y.,
December 15, 2010

2007 WL 389003
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County
Correctional Facility, et al; Nassau County
University Medical Staff and Nassau
County Correctional Facility, Defendants.

Civil Action No. CV-04-4587 (DGT).
|
Jan. 31, 2007.

**Attorneys and Law Firms**

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical
staff, (collectively, "defendants"), seeking damages for
injuries allegedly caused by defendants while he was
incarcerated at NCCF. Defendants now move for
summary judgment pursuant to Fed.R.Civ.P 56 arguing,
*inter alia,* that Hargrove's claims should be dismissed
because he failed to exhaust administrative remedies, as
required by the Prison Litigation Reform Act of 1995
("PLRA"), 42 U.S.C. § 1997e. For the following reasons,
defendants' motions for summary judgment are granted.

**Background**

On August 27, 2004, [1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when
they forcibly administered purified protein derivative skin
tests ("PPD test") to test for latent tuberculosis ("TB")
in April 2002, 2003 and 2004 while he was incarcerated
at NCCF. Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.
Hargrove named Nassau County Sheriff Edward Reilly
("Reilly"), NCCF and Nassau County University Medical
Staff [2] as defendants. [3] On November 22, 2004, after
discovery, County Defendants and NHCC Defendants
filed separate motions for summary judgment pursuant to
Fed.R.Civ.P 56. Both defendants properly filed a Local
Rule 56.1 Statement and served Hargrove a Notice to *Pro
Se* Litigant Opposing Motion for Summary Judgment,
pursuant to Local Civil Rule 56.2.

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go
through medical intake. Aff. of Kim Edwards, ("Edwards
Aff.") ¶ 3. This standard process usually takes seventy-two
hours. Edwards Aff. ¶ 4. During medical intake, NCCF
tests inmates for TB. Aff. of Getachew Feleke ("Feleke
Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent
TB. Feleke Aff. ¶ 3. However, if an inmate has previously
tested positive for TB, it is NCCF's policy to test for TB
using an x-ray instead. [4] Feleke Aff. ¶ 3. As part of its
Infectious Disease Program, NCCF re-tests inmates for
TB each year, beginning after they have been housed in
that facility for one year. Edwards Aff. ¶ 5.

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.
NHCC Defs.' 56.1 Statement ¶ 1. Before entering the
general population, Hargrove was processed through
medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The
NCCF Medical Intake Chart for Hargrove, dated March
15, 2002 ("3/15/02 Chart"), shows that Hargrove informed
medical staff that he had previously been exposed to
tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at

1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test. [5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

### (3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

The first step requires an inmate to submit his grievance form [7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate

Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified

that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II; Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated problem. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy copy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

## Discussion

## (1)

## Summary Judgment Standard

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at \*2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

## (2)

## Prison Litigation Reform Act

### a. Purpose of the Prison Litigation Reform Act

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of

prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525). *See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524). Section 1997e(a) provides that:

> **\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383; *Ruggiero,* 467 F.3d at 174; *Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at \*12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at \*4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19,

2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19, 2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance. [12]

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a)

unless Hargrove can establish excuse for his failure to exhaust.

### (4)

### No Grounds to Excuse Plaintiff's Failure to Exhaust

 **\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11; *Sloane,* 2006 WL 3096031, at *4; *Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175; *Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)). [13]

### a. Whether administrative remedies were "available" to Hargrove

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from

seeking administrative remedies,[14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances[15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's

failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem. of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation. Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465, at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at \*8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at \* 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at

NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at \*4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at \*1, \*3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by

Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has

continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

### All Citations

Not Reported in F.Supp.2d, 2007 WL 389003

Footnotes

1   Hargrove signed the complaint August 27, 2004. The *pro se* clerk's office received and filed the complaint on September 20, 2004. Under the prison mail-box rule, a *pro se* prisoner's complaint is deemed filed when it is delivered to prison authorities. *See, e.g., Walker v. Jastremski,* 430 F.3d 560, 562 (2d Cir.2005)(deeming *pro se* prisoner's § 1983 action filed on date complaint was handed to prison officials). There is no evidence in the record as to when Hargrove handed the complaint to prison officials. However, it is clear the operative date is between August 27, 2004 and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

2   The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s Not. of Motion, Decl., at 1.

3   Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

4   According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* WEBMD, http:// www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

5   Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was

actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

6    Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does not dispute that he received a handbook outlining the IGP.

7    The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

8    Hargrove has not argued that he was unaware of this five-day deadline.

9    There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

10   It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

11   Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

12   Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

13   Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkin v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6, 2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

14   Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

**15**     Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d. at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

---

**End of Document**                                     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5975027
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell
E. Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema,
Sergeant; and Jean Norton, Nurse, Defendants.

No. 9:10–CV–0456 (GTS/DEP).
|
Nov. 29, 2011.

**Attorneys and Law Firms**

Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel, New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Timothy P. Mulvey, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this prisoner civil rights action filed by Jonathan Henry ("Plaintiff") against the five above-captioned employees of the New York State Department of Corrections and Community Supervision ("Defendants"), is Defendants' motion for partial summary judgment. (Dkt. No. 24.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges that, between approximately January 29, 2009, and January 31, 2009, at Ulster Correctional Facility in Napanoch, New York, Defendants violated Plaintiff's following rights in the following manner: (1) Defendants Nurse Jean Norton, Corrections Officer James F.

Dinelle, Corrections Officer Russell E. Duckett and Corrections Officer Alfred J. DeLuca violated Plaintiff's rights under the First Amendment by filing retaliatory false misbehavior reports against him, and subsequently providing false testimony against him at administrative disciplinary hearings, which resulted in his spending time in the Special Housing Unit ("SHU"); (2) Defendant Dinelle violated Plaintiff's rights under the Eighth Amendment by assaulting him on two occasions, and Defendants DeLuca and Duckett violated Plaintiff's rights under the Eighth Amendment by assaulting him once; (3) Defendant Sergeant Donald L. Broekema violated Plaintiff's rights under the Eighth Amendment by failing to intervene to prevent one of these assaults from occurring; (4) Defendant Norton violated Plaintiff's rights under the Eighth Amendment by harassing him almost immediately before he was subjected to the above-described assaults; and (5) Defendants Norton, Dinelle, Duckett and DeLuca violated Plaintiff's rights under the Fourteenth Amendment by performing the aforementioned acts, which constituted atypical and significant hardships in relation to the ordinary incidents of prison life. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

### B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff was an inmate and Defendants were employees of the New York Department of Corrections and Community Supervision at Ulster Correctional Facility. On January 30, 2009, Defendant Dinelle took Plaintiff to the medical ward, because Plaintiff was experiencing a foul odor and oozing from a wound on his leg. After Defendant Norton treated Plaintiff, she filed an inmate misbehavior report against Plaintiff based on (1) Plaintiff's harassing behavior toward Defendant Norton and Defendant Dinelle, and (2) Plaintiff's disobedience of a direct order to be quiet. The misbehavior report was signed by Defendant Dinelle as an employee witness.

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a

sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton). [2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

### C. Defendants' Motion

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim

against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].). [3]

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [4]

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

## B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak, 389 F.3d 379, 380–81 (2d Cir.2004).* Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill, 389 F.3d at 381–383.* Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).* As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, Swierkewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).*

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Gill, 389 F.3d at 380* (citing *Dawes v. Walker, 239 F.3d 489, 492* [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996).*

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.1996); Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).* Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir.1994); Jordan v. Garvin, 01–CV–4393, 2004 WL 302361, at \*6 (S.D.N.Y. Feb.17, 2004).*

### 2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord, 554 F.3d 255, 268 (2d Cir.2009).* In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi, 186 F.3d 252, 262* [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright, 554 F.3d at 268* (quoting *Hudson v. McMillian, 503 U.S. 1, 8 [1992] ).*

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern, 268 F.3d 65, 72*

(2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at *8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

**3. Fourteenth Amendment Substantive Due Process Claims**

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations

omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec.14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65). [5]

**4. Qualified Immunity Defenses**

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would

have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007). [7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). [8] As the Supreme Court has explained,

> [T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable

competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. [9]

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [10]

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity. [11]

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected. [12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity." [13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there

is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. [14] Furthermore, those convictions were never subsequently reversed on administrative appeal. [15] As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

## B. Plaintiff's Claims Under the Eighth Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v. S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at \*11 (N.D.N.Y. Sept.14, 2011) (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced. [16]

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims, [17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff. [18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

### C. Plaintiff's Claim Under the Fourteenth Amendment

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order,

Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions. [19] As a result, Plaintiff's substantive due process claim is dismissed.

### D. Defendants' Defense of Qualified Immunity

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

### 1. Retaliation

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in

question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

### 2. Excessive Force

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999). [20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on

the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is *GRANTED* in part and *DENIED* in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is *GRANTED;*

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is *GRANTED;*

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is *GRANTED;*

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is *GRANTED;* and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is *DENIED;* and it is further

**ORDERED** that the following claims are *DISMISSED* **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are *DISMISSED* from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5975027

Footnotes

1    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

2    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

3    In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

4    Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

5    Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

6    *See also* Pena v. DePrisco, 432 F.3d 98, 115 (2d Cir.2005); Clue v. Johnson, 179 F.3d 57, 61 (2d Cir.1999); McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir.1997); Shechter v. Comptroller of City of New York, 79 F.3d 265, 271 (2d Cir.1996); Rodriguez v. Phillips, 66 F.3d 470, 476 (2d Cir.1995); Prue v. City of Syracuse, 26 F.3d 14, 17–18 (2d Cir.1994); Calhoun v. New York State Div. of Parole, 999 F.2d 647, 654 (2d Cir.1993).

7    *See also* Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); Davis v. Scherer, 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); Benitez v. Wolff, 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

8    *See also* Malsh v. Corr. Oficer Austin, 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; Ramirez v. Holmes, 921 F.Supp. 204, 211 (S.D.N.Y.1996).

9    *See also* Hunter v. Bryant, 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

10   Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See* Boddie v. Schneider, 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

11   *See* Wade–Bey v. Fluery, 07–CV–117, 2008 WL 2714450 at *6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

12   The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g.,* Bridges v. Gilbert, 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; Brown v. Darnold, 09–CV–0240, 2011 WL 4336724, at *4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); Koster v. Jelinek, 10–CV–3003, 2011 WL 3349831, at *3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); Ingram v. SCI Camp Hill, 08–CV–0023, 2010 WL 4973302, at *15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); Lamon v. Junious, 09–CV–0484, 2009 WL 3248173, at *3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); Miller v. Blanchard, 04–CV–0235, 2004 WL 1354368, at *6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

13   McKinnie v. Heisz, 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

14   *See* Hynes v. Squillance, 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); Jermosen v. Coughlin, 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

15   For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See* Samuels v. Mockry, 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The

Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

16    *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity to prevent [an] attack [that ends] in a matter of seconds"); *see also Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

17    (Dkt. No. 27, Attach. 2, at 19–20.)

18    (Dkt. No. 27, Attach. 2, at 10, 14.)

19    *See Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that were more restrictive than those in general population).

20    *See also Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 324898
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.

No. 96 CV 5396(GBD).
|
Feb. 20, 2004.

**Synopsis**

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).

Motion granted.

West Headnotes (1)

[1]     **Civil Rights**
        👉 **Prisons and Jails;Probation and Parole**
        Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

68 Cases that cite this headnote

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10–12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's

wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996. [4]

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10–12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12–13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections. [5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. United States v. Raddatz, 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189–90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C § 636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534–35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996. [6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150–51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993)

(citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

**\*3** Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10–12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18–19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by his fellow inmate. [7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53–54, 57). Thus, plaintiff's claim that he filed the complaint between April 10–12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because

plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim. [8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, \*1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prison officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, \*2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, \*2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, \*3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which

plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two days prior to the date that the Pro Se Office stamped it received on May 10th.[9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendez v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 324898

---

Footnotes

1   Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

2   In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78–81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

3   The amended complaint reads as follows:
    That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10–12 of 1996. (Am.Compl. § 2).

4   Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May

13, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

5    Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

6    In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

7    In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

8    At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37–38).

9    The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

10    In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2–3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

---

**End of Document**
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Arnett v. Shojaie,   C.D.Cal.,   November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,

v.

R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing,

documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-

step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7. [1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply

to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process. [4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative. [6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

> A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

> B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

> C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). [7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, [8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. [9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [10] (b) the inmate was specifically informed that the claim

in question was grievable, [11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, [12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, [13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC. [14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, [15] and/or (b) the inmate did not appeal his disciplinary hearing conviction. [16]

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *\*4* (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court. [18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury. [19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law. [20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the

relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process,

courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380 F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.)

Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

## C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative

remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is *DISMISSED* **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 1235591

Footnotes

1    *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3    *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g* ., DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step.); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure

to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7   The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8   *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9   *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10  *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11  *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12  *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13  *See, e.g., Petrusch v. Oliloushi,* 03-CV-6917, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14  *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15    *See, e.g., Chavis,* 2007 WL 2903950, at \*9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16    *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at \*2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at \*5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

17    *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at \*8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at \*10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at \*4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at \*1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

18    *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at \*10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at \*8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19    *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at \*7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at \*5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20    *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, \*3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at \*5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at \*4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing

be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff's] grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff's] failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21    *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22    *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb. 4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23    The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24    In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance

Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26    *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27    *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28    The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

2014 WL 4659327
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeffrey A. NELSON, Plaintiff,

v.

Bruce PLUMLEY, et al., Defendants.

No. 9:12–CV–422.
|
Signed Sept. 17, 2014.

**Attorneys and Law Firms**

Jeffrey A. Nelson, Attica, NY, for Plaintiff.

Hon. Eric T. Schneiderman, New York State Attorney General, Gregory Rodriguez, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* 42 U.S.C. § 1983 action was referred to the Hon. David E. Peebles, Jr. United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b). Magistrate Judge Peebles recommends that the Defendants' motion for summary judgment, dkt. # 49, be granted in part and that the Court conduct an evidentiary hearing to determine whether Plaintiff's failure to exhaust his administrative remedies on his excessiveforce claim can be excused. *See Dkt. # 59.* Plaintiff has filed objections to the ReportRecommendation.

When objections to a magistrate judge's Report–Recommendation are lodged, the Court reviews the record *de novo. See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Court may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.* Thus, the Court reviews the instant matter *de novo.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt in part the recommendation of Magistrate Judge Peebles for the reasons stated in the ReportRecommendation. Therefore:

1. Plaintiff's objections, dkt. # 60, to the Report–Recommendation of Magistrate Judge Peebles, dkt. # 59, are hereby OVERRULED;

2. The Report–Recommendation is hereby ADOPTED;

3. The Defendants' motion for summary judgment, dkt. # 49, is GRANTED in part and DENIED in part. The motion is GRANTED with respect to Plaintiff's Eighth Amendment conditions-of-confinement claim and Fourteenth Amendment procedural due process claim. The motion is DENIED with leave to renew with respect to Defendants' claim that Plaintiff failed to exhaust his administrative remedies on *all* of his claims. An evidentiary hearing is necessary to determine whether Plaintiff exhausted his administrative remedies with respect to his remaining excessive-force claim against Defendants Plumley and Spear. Defendants may renew their motion following this hearing; and

4. The case is REFERRED to Magistrate Judge Peebles to conduct an evidentiary hearing on exhaustion of administrative remedies. The Magistrate Judge should also consider Plaintiff's request to have counsel appointed to represent him at that hearing.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Pro se plaintiff Jeffrey A. Nelson, a New York State prison inmate, has brought this action pursuant to 42 U.S.C. § 1983 alleging that several individuals employed by or affiliated with the New York State Department of Corrections and Community Supervision ("DOCCS") have deprived him of his civil rights. Plaintiff contends that, while incarcerated, two of the defendants used excessive force against him, two other defendants subjected him to conditions of confinement tantamount to cruel and unusual punishment, and a fifth defendant

denied him procedural due process during a disciplinary hearing.

**\*2** Now that discovery in the action has closed, defendants have moved for summary judgment dismissing plaintiff's claims. Defendants seek dismissal of two of plaintiff's claims based on his alleged failure to exhaust administrative remedies before filing suit, and contend that plaintiff's other claims lack merit. For the reasons set forth below, I recommend that plaintiff's conditions of confinement and due process claims be dismissed on the merits, and that an evidentiary hearing be conducted to determine whether plaintiff properly exhausted available administrative remedies in connection with his excessive force claim.

### I. *BACKGROUND* [1]

Plaintiff is a prison inmate currently in the custody of the DOCCS. *Dkt. No. 1 at 1.* While he is now incarcerated elsewhere, at the time of the relevant events Nelson was confined in a satellite unit of the Central New York Psychiatric Center ("CNYPC") in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *Id.* at 1, 4. Plaintiff suffers from mental illnesses, described by him as "depression, nervous panic attacks, ... and memory loss." *Id.* at 16.

On December 26, 2011, plaintiff was placed in the Residential Crisis Treatment Program ("RCTP") at Clinton for observation based upon a threat of self-harm. *Dkt. No. 50–1 at 2.* Upon entering an observation cell in the RCTP, plaintiff was provided with a specialized tear—and fire-resistant mattress, two tear-resistant mats, a specialized tear-resistant smock, soap, a toothbrush, and toothpaste.[2] *Id.*

Plaintiff alleges that, on January 3, 2012, while confined in his RCTP observation cell, he was involved in an altercation with defendants Bruce Plumley and Jeffrey Spear, both of whom are corrections officers at Clinton. *Dkt. No. 1 at 4–5; Dkt. No. 57–1 at 11–12.* Plaintiff alleges that he was assaulted by the two officers without provocation and, as a result, lost consciousness and suffered a concussion and laceration near his right eye requiring stitches. Dkt. No. 1 at 7; Dkt. No. 57–1 at 12–13. After being treated for his injuries by medical staff at Clinton, Nelson was returned to the RCTP observation cell without incident. Dkt. No. 49–6 at 2, 6.

As a result of the physical altercation, defendants Plumley and Spear each issued plaintiff separate misbehavior reports dated January 3, 2012. *Dkt. No. 1 at 13; Dkt. No. 49–3 at 2,* 9–10. Both misbehavior reports accused Nelson of failing to obey a direct order, assaulting a staff member, and engaging in violent conduct. *Dkt. No. 49–3 at 2,* 9–10. Beginning on or about January 9, 2012, Corrections Lieutenant John Miller, a defendant in this action, conducted a Tier III disciplinary hearing to address the charges contained in the misbehavior reports.[3] *Id.* at 3, 58–89. On or about January 20, 2012, following the close of the hearing, defendant Miller found Nelson guilty on all six counts, and imposed a penalty that included eighteen months of disciplinary confinement in a facility special housing unit ("SHU"), with a corresponding loss of telephone, package, and commissary privileges, and a recommendation that plaintiff lose twelve months of good time credits. *Id.* at 12, 88–89. Defendant Miller's determination was affirmed following review by D. Venettozzi, the DOCCS Acting Director of Special Housing/Inmate Disciplinary Program. *Id.* at 91.

**\*3** On January 3, 2012, the date of the alleged assault by defendants Plumley and Spear, the RCTP cells at Clinton were monitored by defendant Dr. Sohail Gillani,[4] a psychiatrist employed by the New York Office of Mental Health ("OMH") and assigned to the CNYPC satellite unit at Clinton. *Dkt. No. 50–1 at 1,* 3. On that date, according to defendant Gillani, he ordered that plaintiff be permitted only a smock in his cell after determining that plaintiff was at risk to himself, based upon his expression of suicidal ideation. *Id.* at 3. A "smock only" instruction meant that plaintiff would be provided only with a cloth smock comprised of heavy tear-resistant quilted material and designed to provide coverage and warmth to his body and reduce the risk of self-inflicted harm. *Dkt. No. 50–1 at 3.* In accordance with standard procedures applicable to observation cells in the RCTP, defendant Gillani's "smock only" order, and his corresponding instruction that plaintiff not be provided a blanket, were to be reviewed every twenty-four hours. *Id.* at 4. Accordingly, plaintiff was evaluated on January 4, 2012, by defendant Dr. Jean Berggren, another OMH psychiatrist assigned to the facility. Dkt. *No. 50 at 1,* 3. Based upon her observations, defendant Berggren discharged plaintiff from the RCTP on that date. *Id.* at 3–4.

Plaintiff, in some contrast, alleges that while confined in an RCTP observation cell after receiving medical treatment and meeting with defendant Gillani on January 3, 2012, he was left naked and "without a[ ] mattress, mats, smock, clothes, shoes, blanket, nor any shelter of warmth" for twenty-two hours in an "extremely cold cell." *Dkt. No. 1 at 9–10,* 13; Dkt. *No. 57–1 at 16.* In support of their motion, however, defendants have submitted evidence demonstrating that the temperatures in the CNYPC satellite unit, where the RCTP observation cells are located, are controlled by a Siemens computerized heating and cooling system designed to maintain a temperature of between 68 and 72 degrees Fahrenheit. *Dkt. No. 49–7 at 2.* The computers used in connection with the heating and cooling system are located in the main maintenance office at Clinton and a maintenance office located in the basement of Building 156, the building in which the CNYPC satellite unit is located. *Id.* Those computers are accessible only to maintenance workers at Clinton. *Id.* While there are thermometers in Building 156 that corrections officers and other staff members may use to verify and record temperatures, there are no manually adjustable thermostats located in the building to permit adjustment of the computer-controlled temperatures. *Id.* Accordingly, OMH employees have no ability to control ambient temperatures within the CNYPC satellite unit at Clinton. *Dkt. No. 50 at 4; Dkt. No. 50–1 at 4.*

Defendants have also submitted excerpts of logbook entries recording readings taken from thermometers located in the CNYPC satellite unit, and specifically the RCTP observation cell in which plaintiff was confined at the relevant times. *Dkt. No. 49–6 at 2.* According to those logbooks, the temperature recorded at the beginning of the 3:00 p.m. to 11:00 p.m. shift on January 3, 2012, was 70 degrees. *Dkt. No. 49–6 at 7.* At the beginning of the next shift, commencing at 11:00 p.m., the temperature was recorded at 72 degrees. *Dkt. No. 49–6 at 8.* At 6:55 a.m. on January 4, 2012, the temperature of the observation cells was recorded at 70 degrees. *Id.* at 9–10.

## II. *PROCEDURAL HISTORY*

**\*4** Plaintiff commenced this action on March 8, 2012. *Dkt. No. 1.* Plaintiff's complaint was accompanied by an application for leave to proceed *in forma pauperis* ("IFP"), a motion for preliminary injunction, and a request for appointment of counsel. Dkt. Nos. 2, 4, 5. Named as defendants in plaintiff's complaint are Corrections Officers Bruce Plumley and Jeffrey Spears;

Drs. Jean Berggren and S. Gillani; Joanne Waldron, a DOCCS mental health unit chief; Lester Wright, DOCCS Deputy Commissioner and Chief Medical Officer; and Corrections Lieutenant John E. Miller. *Dkt. No. 1* at 2–3. Following an initial review of plaintiff's complaint and IFP application, Senior District Judge Thomas J. McAvoy entered an order on June 1, 2012, granting plaintiff IFP status, denying his motions for a preliminary injunction and appointment of counsel, and approving the filing of Nelson's complaint subject to dismissal of his claim asserted against defendants Plumley and Spear for the alleged issuance of false misbehavior reports. *Dkt. No. 9.*

As a result of a subsequent dismissal motion filed by the defendants, my issuance of a report and recommendation concerning that motion, and a decision and order from Senior District Judge McAvoy, issued on March 18, 2013, adopting the report, plaintiff's claims have been further narrowed. Dkt. Nos. 25, 32, 34. By virtue of those decisions and plaintiff's subsequent filing of an affidavit abandoning any claims associated with the duration of his confinement arising from the disciplinary proceeding conducted by defendant Miller, *Dkt. No. 35,* the claims that remain pending are (1) an excessive force cause of action asserted against defendants Plumley and Spear; (2) a conditions of confinement claim asserted against defendants Berggren and Gillani; and (3) a procedural due process cause of action asserted against defendant Miller.

On November 25, 2013, following the close of discovery, defendants moved for the entry of summary judgment. *Dkt. No. 49.* In their motion, defendants request (1) dismissal of plaintiff's excessive force and conditions of confinement claims based upon his alleged failure to exhaust available remedies before commencing suit, and (2) dismissal of plaintiff's conditions of confinement and procedural due process claims on the merits. *See generally Dkt. No. 49–1.* Plaintiff has since responded in opposition to defendants' motion. Dkt. Nos. 55, 57. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); see also Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

**B.** *Exhaustion of Administrative Remedies*
In support of their motion, defendants contend that plaintiff is procedurally barred from pursuing his excessive force and conditions of confinement causes of action based upon his alleged failure to exhaust all available administrative remedies before commencing this action. *Dkt. No. 49–1 at 6–9.*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [5] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete [ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." Woodford, 548 U.S. at 95; *accord, Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007). [6]

**\*6** In accordance with the PLRA, the DOCCS has instituted a grievance procedure, called the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 234898, at \*4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a) (1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee

("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b) (2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [7] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be entered within a specified period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia,* 7 N.Y.C .R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In this case, plaintiff does not contend that he fully exhausted the available administrative remedies with respect to his excessive force and conditions of confinement claims. Rather, he maintains that his efforts to fully exhaust were thwarted by corrections officials at Clinton and at the Upstate Correctional Facility ("Upstate") following his transfer into that facility.

Because there is no record evidence to suggest that plaintiff did fully exhaust the administrative remedies, I have examined only whether plaintiff's failure to exhaust may be excused.

**\*7** In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Id.* If the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

A review of the record in this case reveals a genuine dispute of material fact as to whether plaintiff's efforts to file grievances concerning the incidents at Clinton on January 3, 2012, were obstructed by DOCCS officials. According to plaintiff, he filed two grievances against defendants Plumley, Spear, Gillani, and Berggren while at Clinton on January 9, 2012, and January 10, 2012. *Dkt. No. 57–1 at 2; Dkt. No. 55–3 at 2–3.* Although the photocopies of the grievances submitted by plaintiff in opposition to the pending motion are difficult to decipher, it appears that they contain allegations that he was subjected to excessive force and cold temperatures on January 3, 2012. *Dkt. No. 55–3 at 2–4.* Plaintiff alleges that he provided the two grievances, which were inside a sealed envelope, to an unidentified corrections officer at Clinton responsible for collecting the mail. *Dkt. No. 57–1 at 2.* According to plaintiff, Christine Gregory, the Inmate Grievance Program Supervisor at Clinton, "decline[d] to respond and did not process" his grievances filed in January. [8] *Id.* at 3.

In contrast to plaintiff's contentions, defendants have submitted an affidavit from Gregory, in which she states that there is no record at Clinton of plaintiff filing any grievances dated January 9, 2012, or January 10, 2012. *Dkt. No. 49–5 at 2.* Instead, Gregory notes that, on February 15, 2012, following plaintiff's transfer into Upstate, she received a letter from plaintiff requesting the status of the two grievances allegedly filed in January 2012, while he was still confined at Clinton. *Id.* Gregory responded to him by memorandum, advising him that there was no record of plaintiff filing grievances dated January 9, 2012, or January 10, 2012. *Dkt. No. 49–5 at 7.* She further advised plaintiff that any complaints must be processed through the IGP at Upstate, the facility in which he was then confined. *Id.*

**\*8** In apparent compliance with Gregory's instruction, on or about February 16, 2012, plaintiff attempted to file his grievances concerning the incident at Clinton on January 3, 2012, to Brandi White, the Inmate Grievance Program Supervisor at Upstate. *Dkt. No. 49–4 at 7–9.* In a cover letter, plaintiff advised White that he had attempted to file the grievances at Clinton but "that prison made the remedy unavailable by obstructing access to the grievance process." *Id.* at 7. Without addressing plaintiff's allegation of obstruction to the IGP at Clinton, White wrote plaintiff a memorandum, dated February 17, 2012, advising that his grievances submitted to her at Upstate were untimely, and, in accordance with DOCCS policies, she returned the grievances to plaintiff. *Id.* at 13. Plaintiff again attempted to file his grievances at Upstate on February 22, 2012, and White again rejected them as untimely.[9] *Id.* at 3, 15. In his affidavit submitted in opposition to the pending motion, plaintiff insists that Gregory and White "intentionally inhibited and obstructed [him] from using and availing himself of the facilities ['] administrative grievance program by not processing [his] two timely filed grievance complaints." *Dkt. No. 57–1 at 3.*

In light of the foregoing record evidence, I find that a dispute of fact exists as to whether special circumstances exist justifying plaintiff's failure to fully exhaust the available administrative remedies prior to commencing this action.[10] The Second Circuit has said that "non-exhaustion is an affirmative defense subject to estoppel in cases where prison officials inhibit an inmate's ability to utilize administrative grievance procedures." *Giano,* 380 F.3d at 677 (citing *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004)). Although courts in this circuit have interpreted this holding to mean that only a named-defendant may be *estopped* from asserting the exhaustion defense,[11] other courts have extended the spirit of the holding by applying special circumstances where a non-defendant prison official interferes with an inmate-plaintiff's ability to file a grievance. *See, e.g., Murray,* 2010 WL 1235591, at *6 (finding an allegation "that an unspecified number of unidentified corrections officers (who are not [named-defendants] ) somehow interfered with the delivery of [the plaintiff's] grievance and appeals ... could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations"); *Sandin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (finding that the plaintiff's allegation that a prison official's "refusal to accept or forward plaintiff's appeals ... effectively rendered the grievance process unavailable to [the plaintiff]" and would also constitute special circumstances). Because plaintiff has alleged that DOCCS officials (including the unidentified corrections officer at Clinton responsible for collecting mail, as well as Gregory and White) interfered with his ability to file the grievances concerning the incident at Clinton on January 3, 2012, and defendants have not provided the court with evidence to the contrary, I find that a dispute of material fact exists precluding the granting of defendants' motion with respect to their contention that plaintiff failed to exhaust the available administrative remedies prior to commencing this action. Accordingly, I recommend that the court conduct an evidentiary hearing to evaluate the issues of fact and assess plaintiff's credibility.[12] *See Messa v. Goord,* 652 F.3d 305, 310 (2d Cir.2011) ("[T]he Seventh Amendment does not guarantee a jury trial on factual disputes regarding administrative exhaustion under the PLRA.").

### C. *Conditions of Confinement*

**\*9** Although defendants seek dismissal of plaintiff's conditions of confinement claim, asserted against defendants Berggren and Gillani, based on plaintiff's failure to exhaust administrative remedies, they also contend the claim is ripe for dismissal on the merits. Specifically, defendants maintain that, based on the record evidence, no reasonable factfinder could conclude that plaintiff was subjected to cruel and unusual punishment under the Eighth Amendment. *Dkt. No. 49–1 at 7–13.* Defendants also contend that defendant

Berggren was not personally involved in the alleged constitutional violation, and defendant Gillani, who is allegedly responsible for plaintiff remaining naked in the RCTP observation cell for twenty-two hours, is entitled to qualified immunity from suit. *Id* . at 13–15.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or 'involve[s] the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981)). A claim alleging that prison conditions have violated the Eighth Amendment must satisfy both an objective and subjective requirement. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996). As to the objective requirement, "the plaintiff must demonstrate that the conditions of his confinement result in 'unquestioned and serious deprivations of basic human needs.' " *Jolly,* 76 F.3d at 480 (quoting *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.2985)); *see also Walker v. Schult,* 717 F.3d. 119, 125 (2d Cir.2013) ("To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."). As to the subjective requirement, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference,' " *Jolly,* 76 F.3d at 480 (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)); *see also Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *see also Waldo,* 1998 WL 713809, at *2; *Davidson,* 920 F.Supp. at 308.

Without question, exposure to extreme temperatures in a prison setting can constitute cruel and unusual punishment as proscribed under the Eighth Amendment. *See Benjamin v. Fraser,* 343 F.3d 35, 52 (2d Cir.2003), *overruled on other grounds by Caiozzo v. Koreman,* 581

F.3d 63 (2d Cir2009), (affirming the district court's conclusion that "exposure to extremes of temperature violated the detainees' constitutional rights"); *Gatson v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (finding that the plaintiff's allegation that he was exposed to freezing temperatures from November 1990 through March 1991 stated a claim under the Eighth Amendment); *Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (reversing the district court's grant of summary judgment where there was evidence that the plaintiff had been deliberately exposed to bitter cold in his cell block for three months).

**\*10** In this instance, plaintiff maintains that, by virtue of defendant Gillani's orders to DOCCS corrections officers, he was left naked in his RCTP observation cell and subjected to "extreme[ ] cold" for a period of "twenty-two hours" between January 3, 2012, and January 4, 2012. *Dkt. No. 1 at 9–10, 13; Dkt. No. 57–1 at 16.* In support of their motion for summary judgment, however, defendants have submitted evidence demonstrating that (1) the temperature in Building 156, where the CNYPC satellite unit is located, is controlled by a computer system located separate from the unit, and set to between 68 and 72 degrees at all times; (2) during the twenty-two hours in question, DOCCS corrections officers independently confirmed that the temperature in the unit was within the specified range; (3) only maintenance staff is authorized and able to access the computer system controlling the temperature in Building 156, and, accordingly, neither defendant Berggren nor defendant Gillani could have altered the temperature in plaintiff's cell; and (4) after he received medical treatment following the alleged assault by defendants Plumley and Spear, plaintiff expressed suicidal ideation to defendant Gillani, who subsequently issued an order that plaintiff be denied a blanket and anything other than a smock in order to prevent any attempted self-harm. *Dkt. No. 49–6 at 2,* 7, 8, 9–10; *Dkt. No. 49–7 at 2; Dkt. No. 50 at 4; Dkt. No. 50–1 at 4.*

While the court acknowledges the parties' conflicting accounts regarding the temperature in plaintiff's cell on January 3, 2012, and whether he was provided any clothing at all on that date, even assuming plaintiff's version of the events are accurate, I find that no reasonable factfinder could conclude that plaintiff was subjected to cruel and unusual punishment by defendants Berggren and Gillani. [13] *See Trammell v. Keane,* 338 F.3d 155, 164–65 (2d Cir.2003) (concluding that the plaintiff "no doubt" experienced uncomfortable conditions of confinement,

including, according to the plaintiff, being kept naked for a " 'prolonged period in bitter cold,' " but finding no constitutional violation where there was no evidence "that the cell in which he was housed was open to the elements, that it lacked adequate heat, or … that the cell was 'bitter cold' "); *Flake v. Peck,* No. 12–CV–0517, 2014 WL 1289582, at *21 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J., *adopting report and recommendation by* Baxter, M.J.) (finding that the plaintiff's allegations that he was subjected to bitter cold in various cells from July 2010 until January 2011 was not sufficient to defeat the defendants' motion for summary judgment where the defendants had submitted evidence that the plaintiff was given one blanket when he asked for it and maintenance checked the temperature of his cells when he complained of the temperature); *Borge v. McGinnis,* No. 03–CV–6375, 2007 WL 1232227, at *5–6 (W.D.N.Y. Apr. 26, 2007) (dismissing the plaintiff's conditions of confinement claim where he alleged that, for three days, he was provided only a paper gown, paper slippers, and a thin mattress in a cell maintained at approximately fifty degrees). Moreover, plaintiff's mere allegations that he was left naked in an "extremely cold cell," without any supporting evidence, are insufficient to defeat defendants' motion, which includes evidentiary support demonstrating that plaintiff's RCTP observation cell was maintained at a reasonably warm temperature on January 3, 2012, and January 4, 2012. *See BellSouth Telecomm., Inc. v. W.R. Grace & Co.-Conn.,* 77 F.3d 603, 615 (2d Cir.1996) ("An adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion for summary judgment must set for concrete particulars. It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." (quotation marks, alterations omitted); *Wilson Jones v. Gilbert & Bennette Mfg. Co.,* 332 F.2d 216, 219 (2d Cir.1964) ("Mere conclusory affidavits that an issue exists no longer suffice to defeat well[-]grounded motions for summary judgment."). Accordingly, I recommend that the court grant defendants' motion for summary judgment with respect to plaintiff's conditions of confinement claim asserted against defendants Berggren and Gillani.

## C. *Procedural Due Process*

**\*11** Defendants also seek dismissal of plaintiff's due process claim, based on their contention that plaintiff received the full panoply of rights guaranteed under the Fourteenth Amendment during the Tier III disciplinary

hearing conducted by defendant Miller. *Dkt. No. 49–1 at 16–21.*

Under the Fourteenth Amendment, a prison inmate who is deprived of a protected liberty interest must be afforded due process of law.[14] *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v.. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, and include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell,* 418 U.S. 539, 564–69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to … an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *Wolff,* 418 U.S. 570–71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia,* does not prejudge the evidence and who cannot say … how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen,* 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill,* 472 U.S. at 455).

Here, plaintiff alleges that he was denied due process when defendant Miller refused to call several witnesses requested by plaintiff, including defendants Berggren and Gillani, twenty-three other OMH staff, and the nurse that treated plaintiff following the alleged assault by defendants Plumley and Spear. *Dkt. No. 1 at 13–16; Dkt. No. 57–1 at 19–24.* According to plaintiff, those individuals may have witnessed the alleged assault. *Id.* Plaintiff also accuses defendant Miller of being impartial during the disciplinary hearing, and failing to afford him the opportunity to present a proper defense. [15] *Id.*

**\*12** To refute plaintiff's allegations, defendants have submitted several documents related to the disciplinary hearing, including a full transcript of the hearing that commenced on January 9, 2012. *Dkt. No. 49–3 at 3.* Although plaintiff initially refused assistance in preparing for the hearing, once it commenced, he reconsidered and requested assistance. *Dkt. No. 49–3 at 15,* 61–62. Defendant Miller adjourned the hearing at that time to permit plaintiff to meet with his assistant and prepare a defense. *Dkt. No. 49–3 at 62.* The assigned assistant, A. Bezzio, met with plaintiff on January 10, 2012, and submitted a request for any unusual incident report concerning the altercation between defendants Plumley and Spear and plaintiff, as well as the opportunity to review the videotape recording of plaintiff's escort to medical personnel for treatment. *Dkt. No. 49–3 at 16.* The assistance form filed by Bezzio did not list any potential witnesses to be interviewed. *Id.*

At the continuation of the hearing, on January 18, 2013, although plaintiff requested testimony from two inmates who were confined in adjoining RCTP observation cells at the time of the alleged assault, those inmates refused to testify. *Dkt. No. 49–3 at 18–19,* 69–71. Defendant Miller reviewed the videotape depicting plaintiff's escort to the prison hospital following the incident, and then plaintiff testified in his own defense. *Id.* at 63–72. After determining that live testimony should be elicited from defendants Plumley and Spear, defendant Miller again adjourned the hearing. *Id.* at 70.

Plaintiff's Tier III disciplinary hearing resumed on January 20, 2012. *Dkt. No. 49–3 at 73.* During that session, defendants Plumley and Spear testified that the incident occurred in the RCTP observation cell area and there were no staff members other than themselves in the vicinity. *Dkt. No. 49–3 at 74–80.* Plaintiff's disciplinary hearing was

again adjourned and resumed on January 23, 2012, based on plaintiff's request that Sergeant W. Bissell, the area supervisor on the date of the incident, be called to testify. *Dkt. No. 49–3 at 84–86.*

During the hearing, defendant Miller addressed plaintiff's request for additional unidentified witnesses and determined that no one was present during the incident, as alleged by plaintiff. Defendant Miller based his determination, in part, on the testimony of Sergeant Bissell, who stated that when he arrived after the incident, "there was nobody on that company." *Dkt. No. 49–3 at 86.* Defendant Miller also reviewed the logbook for the unit where plaintiff was housed on January 3, 2012, and concluded that no one had entered the area at or around the time of the incident, and up until after the incident. [16] *Id.* at 80–81. Although plaintiff requested the testimony of the nurse that treated him after the incident, defendant Miller denied that request because the nurse had not been present during the incident and therefore could not provide any relevant testimony. *Id.* at 87. At the conclusion of the hearing, defendant Miller provided plaintiff with a written disposition finding him guilty of all of the charges listed in the two misbehavior reports issued by defendants Plumley and Spear. *Id.* at 88–89. Defendant Miller based his findings based on several pieces of evidence, including the misbehavior reports authored by defendants Plumley and Spear, the unusual incident report, the use of force paperwork, employee injury reports and photos, the testimonies of defendants Plumley and Spear, and the testimony of OMH staff regarding plaintiff's mental health status at the time of the incident. *Id.*

**\*13** In light of the foregoing evidence, I conclude that plaintiff was not deprived any due process. With respect to plaintiff's request to call two inmates that may have seen or heard the altercation on January 3, 2012, "[a] hearing officer has no power to force an inmate to testify, and when the inmate refuses, the hearing officer need not call that witness." *Dumpson v. Rourke,* No. 96–CV–0621, 1997 WL 610652 at \*5 (N.D.N.Y. Sept. 26, 1997) (Pooler, J., *adopting report and recommendation by* DiBianco, M.J.) (citing *Silva v. Casey,* 992 F.2d 20, 21–22 (2d Cir.1993)); *see also Wolff,* 418 U.S. at 568–69 (recognizing prison officials' discretion to call inmates as witnesses). In addition, defendant Miller's decision not to call plaintiff's treating nurse, as requested by plaintiff, was also reasonable. It is clear from plaintiff's testimony that the

nurse was not present during the alleged assault, and the record of plaintiff's injuries and treatment, coupled with the videotape reviewed by defendant Miller, adequately addressed their scope and extent. *See Wolff,* 418 U.S. at 566 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Defendant Miller's failure to call several other unidentified individuals to determine whether they had any additional information was also reasonable based on the testimonies of defendants Plumley and Spear and Sergeant Bissell, to the effect that no one else was present at the time of the altercation. *See Silva,* 992 F.3d at 21–22 ("[I]f a prison official, presiding over a prison disciplinary hearing, reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights."). Finally, a careful review of the hearing record reveals that defendant Miller's determination was well supported by the evidence presented.

In sum, the record evidence in this case discloses that plaintiff was afforded the full extent of the procedural process due him under *Wolff* and its progeny, and no reasonable factfinder could conclude otherwise. Accordingly, I recommend dismissal of plaintiff's due process cause of action asserted against defendant Miller.

IV. *SUMMARY AND RECOMMENDATION*

Defendants' arguments concerning plaintiff's alleged failure to exhaust available administrative remedies before commencing suit present issues of fact that must be addressed during an evidentiary hearing before the question of exhaustion can be decided by the court as a matter of law. Turning to the merits of plaintiff's conditions of confinement and due process claims, I conclude that no reasonable factfinder could find that plaintiff was exposed to conditions tantamount to cruel and unusual punishment or was denied procedural due process in connection with his Tier III disciplinary hearing. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (*Dkt. No. 49* ) be GRANTED, in part, and that plaintiff's Eighth Amendment conditions of confinement and Fourteenth Amendment procedural due process claims be DISMISSED; and it is further hereby

**\*14** RECOMMENDED that an evidentiary hearing be conducted pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), to address whether, with respect to his Eighth Amendment excessive force claim, plaintiff's failure to exhaust administrative remedies prior to commencing this action may be excused.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed Aug. 13, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4659327

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    Although plaintiff denies that he was provided with these amenities while in the observation cell, *Dkt. No. 57–1 at 16–17,* the parties' disagreement does not create a genuine dispute of material fact precluding the entry of summary judgment.

3    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also* Hynes v. Squillace, 143 F.3d 653, 655 n. 1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n. 1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

4    The clerk is respectfully directed to modify the court's records to reflect the correct spelling of this defendant's name, as demonstrated in the declaration submitted in support of defendants' pending motion. *Dkt. No. 50–1 at 1.*

5    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

6    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

7    Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c) (i), (ii).

8    Plaintiff also alleges that, in addition to submitting the grievances through the IGP, he sent letters concerning the incidents on January 3, 2012, to the DOCCS Inspector General and other officials. *Dkt. No. 57–1 at 2–3.* As noted above, while placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson,* 380 F.3d at 697–98 (emphasis omitted)). Accordingly, to the extent that plaintiff submitted letters to DOCCS officials outside the formal IGP, those efforts are not relevant to the exhaustion analysis.

9    Notwithstanding White's insistence that "[g]rievances that are returned [to inmates] as untimely are not logged in at the grievance office with a date or grievance number" and that the grievances are "returned to the inmate," she attached copies of plaintiff's cover letter and grievances, each dated February 17, 2012, to her affidavit submitted in support of defendants' pending motion. *Dkt. No. 49–4 at 7–9.* White did not, however, attach a copy of the grievances submitted to her by plaintiff on February 22, 2012.

10    Plaintiff does not allege that the IGP was unavailable to him, nor does he contend that any of the named defendants attempted to thwart his efforts to process his grievances. Accordingly, the first two exceptions to the exhaustion rule under *Macias* and *Hemphill* are not applicable in this action. *See, e.g., Collins v. Caron,* No. 10–CV–1527, 2014 WL 296859, at *5–6 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.) ("A defendant in a prisoner civil rights action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies ... based on the actions or inactions of *other* individuals." (citing cases) (emphasis in original)).

11    *See, e.g., Collins,* 2014 WL 296859, at *5–6 (citing cases).

12    Because I recommend that plaintiff's conditions of confinement claim be dismissed on the merits, *see* Part III.C., *post,* however, during the evidentiary hearing, the court need only inquire into whether plaintiff is excused for failing to exhaust administrative remedies in connection with his excessive force claim asserted against Plumley and Spear.

13    In his affidavit, plaintiff also states that an unidentified corrections sergeant told him that he was secured in his cell without a mattress, mats, or a smock based on a " 'doctor[']s orders.' " *Dkt. No. 57–1 at 15–16.* Setting aside the fact that the identity of both the corrections sergeant and doctor referenced are unknown, the corrections sergeant's statement constitutes inadmissible hearsay. Consequently, plaintiff cannot be rely on the statement to create a genuine dispute of material fact. *See Burlington Coat Factory Warehouse Corp. v. Espirit de Corp.,* 769 F .2d 919, 924 (2d Cir.1985) ("[A party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment."); *accord, Chansamone v. IBEW Local 97,* 523 F. App'x 820, 822 n. 4 (2d Cir.2013).

14    Because the penalty imposed by defendant Miller, following plaintiff's Tier III hearing, included eighteen months of disciplinary SHU confinement, plaintiff has satisfied the element of a due process claim requiring that he be deprived a protected liberty interest. *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding that, even under normal SHU conditions, confinement for more than 305 days implicates a prisoner's liberty interests); *accord, Palmer v. Richards,* 364 F.3d 60, 65 (2d Cir.2004).

15    Plaintiff also complains that his disciplinary hearing was not timely commenced. *Dkt. No. 1 at 16.* That argument, however, is based upon New York State regulations governing disciplinary hearings. *See, e.g.,* 7 N.Y.C.R.R. § 251–5.1. It is well settled, however, that "violations of state law that do not deprive the plaintiff of a right 'secured by the Constitution and laws' are insufficient to support a claim under [section] 1983." *Allred,* 2010 WL 3911414, at *5 (quoting *Baker v. McCollan,* 443 U.S. 137, 139–40 (1979)); *see also Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990).

16    According to defendant Miller, anyone entering the unit, whether an employee or otherwise, is required to sign the logbook in accordance with facility policy. *Dkt. No. 49–3 at 6.*

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2639369
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent,
Deputy Ryan, Defendants.

No. 9:04-CV-0471.
|
Sept. 13, 2006.

**Attorneys and Law Firms**

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out
of his placement at the Southport Correctional Facility.
In his Complaint, Plaintiff alleges that he was improperly
sent to the Special Housing Unit ("SHU") at a maximum
security facility and that being in SHU has put his life
in jeopardy. Currently before the Court is Defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.
56 seeking dismissal of the Complaint in its entirety for
failure to exhaust administrative remedies.

### I. FACTS [1]

Plaintiff is an inmate in the custody of the New York
State Department of Correctional Services. Plaintiff
signed the instant Complaint on April 7, 2004. On
his Complaint form, Plaintiff indicated that there is
a grievance procedure available to him and that he
availed himself of the grievance procedure by filing a
complaint with the IGRC [2], followed by an appeal to
the superintendent of the facility, and then to the Central
Office Review Committee in Albany. The Complaint

indicates that Plaintiff is "waiting for response from
Albany." The Complaint was filed on April 27, 2004.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced
the instant litigation. On May 3, 2004, after Plaintiff filed
the Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

### II. DISCUSSION

The sole issue presented is whether Plaintiff was
required to complete the administrative process before
commencing this litigation. This issue has already been
addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d
116 (2d Cir.2001). The issue in that case was "whether
plaintiff's complaint should have been dismissed despite
his having exhausted at least some claims during the
pendency of his lawsuit." *Id.* at 121. The Second Circuit
held that "exhausting administrative remedies after a
complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a
legally sufficient source that an administrative remedy
is available and applicable. *Mojias v. Johnson,* 351 F.3d
606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1,
*et seq.* Plaintiff's Complaint concerns his placement in
SHU at a maximum security facility. These are matters
that fall within the grievance procedure available to
NYSDOCS inmates and are required to be exhausted
under the Prison Litigation Reform Act, 42 U.S.C. §
1997e. Plaintiff has failed to demonstrate any applicable
exception to the exhaustion requirement. Because Plaintiff
commenced the instant litigation prior to fully completing
the administrative review process, the instant Complaint
must be dismissed without prejudice. *Neal,* 267 F.3d 116.

### III. CONCLUSION

 **\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2639369

Footnotes

1    The following facts are taken from Defendants' statement of material facts submitted pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

2    Inmate Grievance Review Committee.

**End of Document**                                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Robinson v. Delgado, Not Reported in F.Supp. (1998)

1998 WL 278264

1998 WL 278264
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and
Lieutenant; and Donald Selsky, Director of
Inmate Special Housing Program, Defendants.

No. 96–CV–169 (RSP/DNH).
|
May 22, 1998.

**Attorneys and Law Firms**

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

 *1 Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that
they violated his right to due process in the course
of a disciplinary proceeding and subsequent appeal.
On September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived
him of a liberty interest within the meaning of the Due
Process Clause. Plaintiff did not oppose the summary
judgment motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face
of the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear
error on the face of the record. After being warned

by defendants' motion that he must offer proof in
admissible form that his disciplinary confinement imposed
an "atypical and significant hardship on the inmate
in relation to the ordinary incidents of prison life,"
Robinson failed to offer any such proof. *Sandin v. Conner,*
515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418
(1995). Consequently, he cannot maintain a due process
challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it
is further

ORDERED that the Clerk of the Court serve a copy of
this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT—RECOMMENDATION

The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local
rules of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth,
and Fourteenth Amendment rights under the United
States Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed R. Civ. P. 56.
However:

> When a motion for summary
> judgment is made and supported as
> provided in this rule, an adverse
> party may not rest upon the mere
> allegations or denials of the adverse
> party's pleading, but the adverse
> party's response, by affidavits or
> as otherwise provided in this rule,
> must set forth specific facts showing
> that there is a genuine issue for
> trial. If the adverse party does not
> so respond, summary judgment, if

Robinson v. Delgado, Not Reported in F.Supp. (1998)

1998 WL 278264

appropriate, shall be entered against
the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

**\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report–Recommendation, by regular mail, upon the parties to this action.

**All Citations**

Not Reported in F.Supp., 1998 WL 278264

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1266957
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John White, Plaintiff,
v.
Jeffrey Clark, et al., Defendants.

9:12-CV-986 (NAM/DJS)
|
Signed 03/31/2016

**Attorneys and Law Firms**

John H. White 08-A-3366, Southport Correctional
Facility, P.O. Box 2000, Pine City, New York 14871,
Plaintiff, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, John F. Moore, Esq., Assistant New York
State Attorney, The Capitol, Albany, New York 12224,
Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Norman A. Mordue, Senior U.S. District Judge

Plaintiff, an inmate in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS"), brought this action under 42 U.S.C. § 1983
alleging excessive force and deliberate indifference to
his serious medical needs in violation of the Eighth
Amendment. Defendants move (Dkt. No. 314) for
summary judgment on the grounds that the claims of
medical indifference are insufficient and/or should be
dismissed based on qualified immunity, and that plaintiff
failed to exhaust his available administrative remedies
prior to bringing this action.

Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c), United States Magistrate Daniel J.
Stewart issued a Report and Recommendation (Dkt.
No. 352) in which he recommends that summary
judgment be granted dismissing all official capacity
claims for monetary damages and all Eighth Amendment
medical deliberate indifference claims against defendants
Rushford, Travers, Lashway, Rock, and Uhler. He

further recommends denial of summary judgment
dismissing the remaining claims – the excessive force
claims – because questions of fact exist requiring an
exhaustion hearing.

Defendant objects (Dkt. No. 368) to so much of the
Report and Recommendation as recommends denial
of summary judgment on the issue of failure to
exhaust. Plaintiff submits an untimely objection, primarily
addressing the medical indifference claims (Dkt. No. 372).
The Court accepts plaintiff's objection in view of his *pro
se* status. Therefore, pursuant to 28 U.S.C. § 636(b)(1)(C),
this Court conducts a *de novo* review of the issues.

The Court adopts Magistrate Judge Stewart's summary
of the relevant facts and law, and refers the reader
thereto. The Court first conducts *de novo* review of
whether summary judgment is warranted dismissing
plaintiff's claims of deliberate indifference to his serious
medical needs. After a thorough review of the record, the
Court adopts Magistrate Judge Stewart's analysis of the
record before him and his conclusion that no rational
jury could find that plaintiff's medical condition was
"sufficiently serious" under *Brock v. Wright*, 315 F.3d
158, 162-63 (2d Cir. 2003),[1] or that defendants knew
of and disregarded an excessive risk to his health such
that they acted with deliberate indifference. *See Farmer
v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128
L.Ed.2d 811 (1994). Plaintiff's objection does not warrant
a different conclusion. The Court notes in particular that
plaintiff's complaints that the pain medication he was
given was "ineffective," that he received "no rehabilitation
of injury," that no "specialist neurological exams" were
performed until many months later, and similar critiques
of the care he received amount to "mere disagreement
over the proper treatment," which does not create a
constitutional claim. *Chance v. Armstrong*, 143 F.3d 698,
703 (2d Cir. 1998).

**\*2** The Court also conducts *de novo* review with
respect to Magistrate Judge Stewart's recommendation
that defendants' summary judgment motion be denied
regarding the excessive force claims, and a hearing be
held on the issue of exhaustion of administrative remedies.
The Court has considered the entire record, including
the declaration of Brandi L. Collyer, a Supervisor
of DOCCS' Inmate Grievance Program at Upstate
Correctional Facility, where plaintiff was housed at
the time of the alleged December 1, 2010 incidents;

the declaration of Jeffrey Hale, the Assistant Director of the DOCCS' Inmate Grievance Program; plaintiff's deposition testimony; and plaintiff's submissions – which exceed 600 pages – in opposition to this motion. Based on the record and the applicable law, the Court agrees with Magistrate Judge Stewart's recommendation to deny so much of defendants' motion for summary judgment as seeks dismissal of the excessive force claims on the ground of failure to exhaust. Plaintiff is entitled to an evidentiary hearing with regard to whether he in fact exhausted his administrative remedies on his excessive force claims and, if he failed to do so, whether special circumstances justified that failure.

It is therefore

ORDERED that the Report and Recommendation of United States Magistrate Daniel J. Stewart (Dkt. No. 352) is adopted and accepted in its entirety; and it is further

ORDERED that defendants' motion (Dkt. No. 314) for summary judgment is granted in part and denied in part as follows:

- Plaintiff's Eighth Amendment claim of deliberate indifference to serious medical needs is dismissed with prejudice;

- Defendants Rushford, Travers, Lashway, Rock, and Uhler are dismissed from the action;

- All monetary damages claims against the remaining individual defendants in their official capacities are dismissed;

- Dismissal of plaintiff's excessive force claims based on the alleged events of December 1, 2012 is denied at this point on the ground that a hearing is required; and

- The Court will schedule an evidentiary hearing on the question of whether plaintiff exhausted his administrative remedies regarding his excessive force claims based on the events of December 1, 2012; and it is further

ORDERED that Clerk of the Court is directed to serve copies of this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 1266957

---

Footnotes

1     As Magistrate Judge Stewart noted, there is no distinct litmus test for a serious medical condition; rather, the seriousness of a condition is determined by factors such as: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003).

---

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                2

KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Vacated in Part, Remanded by *Xu-Shen Zhou v. State University of New York Institute of Technology,* 2nd Cir. (N.Y.), October 10, 2012

2011 WL 4344025

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

XU–SHEN ZHOU, a/k/a Jason Zhou, Plaintiff,

v.

S.U.N.Y. INST. OF TECH.; Dr. Lisa Beradino; Dr. Stephen Havlovic; Dr. William Langdon; and Dr. Peter Spina, personally and in their official capacities, Defendants.

No. 6:08–CV–0444 (GTS/ATB).

|

Sept. 14, 2011.

**Attorneys and Law Firms**

Satter & Andrews LLP, Ross P. Andrews, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Eric. T. Schneiderman, Attorney General for the State of New York, Christina L. Roberts–Ryba, Esq., Douglas J. Goglia, Esq., Susan C. Von Reusner, Esq., of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this employment discrimination action filed by Xu–Shen Zhou ("Plaintiff") against the State University of New York Institute of Technology, Dr. Lisa Berardino, Dr. Stephen Havlovic, Dr. William Langdon, and Dr. Peter Spina ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 69.) For the reasons set forth below, Defendants' motion is granted, and Plaintiff's Amended Complaint is dismissed.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**

Generally, liberally construed, Plaintiff's Amended Complaint alleges that Plaintiff, a person of Chinese nationality and origin, was subject to discrimination during his employment at the State University of New York Institute of Technology ("SUNY IT"). (*See generally* Dkt. No. 28 [Plf.'s Am. Compl.].) More specifically, Plaintiff alleges as follows.

Beginning in August 2005, Defendant Langdon, who was Plaintiff's supervisor, harassed and intimidated Plaintiff by (1) making "repeated negative comments about China and persons of Asian origin," (2) seeking "to have plaintiff do the work for a scholarly publication but include Langdon's name [on that publication]," (3) "encourag[ing] students to make complaints against plaintiff," (4) telling Plaintiff that he could assist Plaintiff with student complaints "if plaintiff helped [him] get a paper published," (5) "unfairly criticizing plaintiff's teaching," (6) "behaving in a menacing manner," and (7) "recommending against plaintiff's reappointment." (*Id.*) Plaintiff complained about Defendant Langdon's behavior to human resources on June 29, 2006, and to Defendant Havlovic on July 6, 2006. (*Id.*) Defendant Berardino also "knew of Plaintiff's complaints of unlawful discrimination."

During Plaintiff's meeting with Defendant Havlovic, Defendant Havlovic "assured Plaintiff that the complaints that had been made by a few students about Plaintiff was a closed issue." (*Id.*) After this meeting, Defendant Havlovic "began to exaggerate the import of those student complaints ... and opposed plaintiff's reappointment." (*Id.*)

Despite Plaintiff's complaints, SUNY IT "failed or refused to take appropriate action to remedy the hostile working environment." (*Id.*) Instead, Defendants "retaliated against plaintiff [by] ... refusing to renew his employment contract." (*Id.*) Defendant Spina also "stated in front of faculty members 'We do not want foreigners' or words to that affect"; and it was her decision not to recommend Plaintiff for reappointment that lead to his termination. (*Id.*)

Based on these (and other) factual allegations, the Court liberally construes Plaintiff's Amended Complaint as asserting the following three claims: (1) a claim of national origin and/or race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

*et seq.* ("Title VII"), 42 U.S.C. § 1981, and Section 292 of the New York State Human Right's Law ("NYHRL"); (2) a claim of hostile work environment based on national origin and/or race under Title VII, 42 U.S.C. § 1981, and Section 292 of the NYHRL; and (3) a claim of retaliation based on national origin and/or race under Title VII, 42 U.S.C. § 1981, and Section 292 of the NYHRL. (*Id.*) Familiarity with the remaining factual allegations supporting these claims in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

**B. Undisputed Material Facts**
 **\*2** The following material facts are not in dispute. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 78, Attach. 7 [Plf.'s Rule 7.1 Response].)

**1. Plaintiff's Initial Employment with SUNY IT**
SUNY IT is a college within the educational system of New York State. In or around July 2005, Plaintiff applied for a position at SUNY IT to teach finance as a faculty member in the School of Business. Plaintiff was initially interviewed over the telephone, and was subsequently interviewed in person during a campus visit. When Plaintiff was interviewing at SUNY IT, he did not disclose that he had received complaints from students about his teaching at Bloomsburg University.

On July 19, 2005, Dr. Peter Spina, the Interim President at SUNY IT, sent to Plaintiff an initial offer of employment, which was contingent upon official notification from the U.S. Citizenship and Immigration Services that Plaintiff had authorization to work at SUNY IT. Plaintiff's employment was scheduled to begin on September 1, 2005, and the offer was for a two-year appointment. Dr. Steven Havlovic, Dean of the School of Business and tenured Professor of Human Resource Management, endorsed the hiring of Plaintiff.

Sometime after Plaintiff began teaching at SUNY IT, students in his class made complaints about him. During the summer of 2006, Plaintiff went on a car ride with Dr. Langdon, a full professor at SUNY IT who served (with all the tenured professors in the School of Business) on the School of Business Review Peer Committee. During the car ride, Dr. Langdon explained to Plaintiff that he and Dean Havlovic had received complaints regarding

Plaintiff's teaching style. Dr. Langdon also told Plaintiff that he and another professor were working on a research project, and indicated that he could use Plaintiff's help.

Shortly after the car ride, Dr. Langdon called Plaintiff, who informed Dr. Langdon that he was not interested in working on the research project. Plaintiff also contacted Dean Havlovic and Anthony Panebianco, Associate Vice President of Human Resources, to complain about the car ride. Dean Havlovic advised Plaintiff that he was not required to work on papers that he did not wish to work on. Dean Havlovic subsequently contacted Dr. Langdon, and instructed Dr. Langdon not to take employees on car rides.

During the fall of 2006, Dr. Langdon was contacted by Dean Havlovic, who informed Dr. Langdon that he had received additional complaints regarding Plaintiff's teaching. By the same point in time, Dr. Langdon also had received written complaints from students regarding Plaintiff's teaching. One student requested to withdraw from Plaintiff's class on account of Plaintiff's limited English language skills. The student stated, "I cannot comprehend [Plaintiff because he] speaks very broken English and most of my class has no idea what he is saying."

**2. Plaintiff's Application for Renewal**
Also during the fall of 2006, Plaintiff's teaching contract was up for renewal. Plaintiff, along with two other candidates, put in applications for two-year renewals. As Dean of the School of Business, Dr. Havlovic sent Plaintiff a memorandum outlining the steps for renewal. The memorandum included a recommended timetable for the Personnel Actions. The memorandum stated that faculty members who were being reviewed would be notified by the appropriate Dean and instructed to complete and/or update their personnel files. Those who wished to have an advocate needed to send the notification by a certain date. The memorandum also outlined the committees that were set up for the review process.

 **\*3** Prior to the President of SUNY IT making a final decision on renewal or non-renewal of a faculty member, it is SUNY IT's practice to receive recommendations from the School's Personnel Committee, the College–Wide Personnel Committee, the Dean, and the Vice President for Academic Affairs. Dr. Lisa Berardino, Associate Professor for the Department of Business,

along with two other professors, Robert Yeh and Ed Petronio, served on the School of Business Personnel Committee (hereinafter "Personnel Committee"). The Personnel Committee served to coordinate the faculty review of professors who are up for employment renewal on behalf of the School of Business Peer Review Committee (hereinafter "Peer Review Committee"). The guidelines that govern the review of professors that are up for renewal are entitled "The State University of New York Policies of the Board of Trustees."

### 3. Personnel Review Committee's Evaluation, Recommendation and Subsequent Action

Pursuant to SUNY IT guidelines regarding the renewal of faculty members, the Personnel Committee was required to organize the three candidates' materials, review them, and ultimately make a recommendation to the Peer Review Committee. Before making their recommendation, Dr. Yeh and Dr. Berardino met to discuss the review of the three candidates. Although Mr. Petronio was invited to the meetings, was a part of the Personnel Committee's recommendation, signed the Personnel Committee's letters, and as was kept informed by Dr. Berardino as to the status of the review process, he was not present for the meetings because he was traveling during most of the review period.

With regard to the standard of review pertaining to the contractual renewal determination, the following five criteria were considered: (i) the candidate's terminal degree; (ii) the candidate's teaching ability and effectiveness; (iii) the candidate's research; (iv) the candidate's university service; and (v) professional development. Under normal circumstances, professors are renewed for two years if the review results in a determination that the candidate is meeting the relevant criteria.

To ascertain effectiveness in teaching, among other things, the Personnel Committee reviewed each candidate's Individual Development and Educational Assessment scores (hereinafter "IDEA"). The IDEA rating system allows students to rate professors by soliciting feedback and evaluating teaching. The scale for IDEA scores goes from one-to-five. A score of one is very bad while a score of five is great. The Personnel Committee also considered a portfolio, put together by the candidate, with information from his or her perspective on each of these

categories, along with written complaint from students (if any).

Plaintiff's IDEA scores were not great. In addition, Plaintiff had received written complaints from students. Nonetheless, Dr. Berardino visited with Ken Wallace, Plaintiff's advocate, and told him that the Personnel Committee was planning to propose a one year renewal. Mr. Wallace indicated that was fine. The Personnel Committee then recommended to the Peer Review Committee that Plaintiff be renewed for one year.

### 4. Peer Review Committee's Evaluation, Recommendation and Subsequent Action

**\*4** The Peer Review Committee, which consisted of eight tenured professors from the business department, met to review the recommendation made by the Personnel Committee. Dr. Berardino was also part of the Peer Review Committee. At the meeting, Robert Orilio, the Undergraduate Coordinator, and William Langdon, the Coordinator of Finance, each expressed his concerns about Plaintiff's inability to teach undergraduate students. A discussion ensued about how the students were being harmed and how they were not learning. Ultimately, the Peer Review Committee rejected the recommendation for a one-year renewal in a vote of 6–2. The rejection of the appointment was based on Plaintiff's weak IDEA evaluations, student complaints, and the comments by coordinators Will Langdon and Dr. Robert Orilio. Dr. Berardino was one of the six faculty members to vote not to renew Plaintiff for a one-year term.

After the Peer Review Committee voted against renewing Plaintiff's contract, the Personnel Committee was required to send this recommendation to the College–Wide Academic Personnel Committee (hereinafter "College–Wide Committee"), which consisted of tenured faculty members across the different schools and areas of SUNY IT. Dr. Berardino prepared a draft memorandum that she circulated by email message to the other two members of the Personnel Committee for their review. The memorandum was then printed, circulated to the three members of the Personnel Committee for their signatures, and sent to the chair of the College–Wide Committee. Dr. Havlovic also received a copy of a memorandum, dated October 31, 2006, which stated that, although the Personnel Committee had recommended a one-year renewal of Plaintiff's application, the Peer

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Review Committee had rejected the appointment by a vote of 6–2.

### 5. College–Wide Committee's Evaluation and Recommendation

After the Peer Review Committee sent the recommendation of non-renewal to the College–Wide Committee, the College–Wide Committee held a meeting, which resulted in a request that Plaintiff's letter, along with the letters for other candidates, be revised. With respect to Plaintiff, the College–Wide Committee asked for more information about the student complaints and Plaintiff's teaching performance.

Dr. Berardino followed up on the instructions of the College–Wide Committee by emailing requests for more information to Dean Havlovic, Ken Wallace, Robert Orilio, and Will Langdon. Specifically, Dr. Berardino requested more information about Plaintiff's teaching performance. The Dean indicated the he would be sending his own letter to the Interim Vice President of Academic Affairs, Rosemary Mullick.

Dr. Berardino also sent an e-mail message to each of the three candidates, and asked them to help with the memorandum that the Personnel Committee would be sending to the College–Wide Committee. Plaintiff responded to the e-mail message by providing a small amount of background information.

On November 14, 2006, Dr. Berardino submitted a revised letter on behalf of the Personnel Committee to the College–Wide Committee. On November 15, 2006, Dr. Langdon prepared a letter to the College–Wide Committee detailing his concerns about Plaintiff's teaching. In the letter, Dr. Langdon stated, in part, that "[Plaintiff's] difficulties speaking the English language preclude his effectively communicating with students in a class room setting." In addition, he wrote, "to recommend [Plaintiff] for reappointment would, in my opinion, render a great disservice to students in the School of Business as well as to Dr. Zhou. His research interest and productivity would potentially be more fully utilized, and more fulfilling to all parties involved, at an institution less oriented to teaching."

 **\*5**  After receiving these letters, the College–Wide Committee met again. At this second meeting, Robert Yeh informed the College–Wide Committee members that

William Langdon had a personal conflict with Plaintiff, which effected the information Langdon provided. During their meeting, the College–Wide Committee asked Dr. Berardino (who was a member of the College–Wide Committee) about her observation of Plaintiff's teaching. Dr. Berardino reported Plaintiff's teaching as "average." The College–Wide Committee ultimately voted 4–1 not to support the Peer Review Committee's vote for non-renewal of Plaintiff's application. Dr. Berardino was the member of the College–Wide Committee who voted against the renewal.

### 6. Vice President Mullick's Evaluation and Recommendation

On November 15, 2006, in response to Dr. Berardino's request for more information about Plaintiff's teaching, Dean Havlovic sent a letter to Dr. Mullick, which stated, in part, that Plaintiff continued to struggle as a finance instructor, that his teaching ratings for his undergraduate courses declined from a 3.1 average in the fall of 2005 to an average of 2.4 in the spring of 2006, and that, as a result, he concurred with the recommendation of the School of Business tenured faculty that Plaintiff's contract not be renewed.

After receiving the memorandum from Dean Havlovic regarding Plaintiff's renewal, Dr. Mullick had conversations with Dean Havlovic, who discussed his level of concern regarding the student complaints about Plaintiff's teaching. During their conversations, Dean Havlovic referred to email messages from students, as well as petitions, where students asked to be removed from the class and reimbursed.

Based on Dr. Mullick's personal review of Plaintiff's file, the student complaints, and the recommendations of non-renewal by the Dean and the tenured faculty in the School of Business, Dr. Mullick recommended that Plaintiff not be reappointed as Assistant Professor of Finance. She sent her recommendation to the Interim President, Dr. Peter Spina, in a memorandum dated November 27, 2006. Dr. Mullick's recommendation not to renew Plaintiff was based entirely on the information that she received regarding Plaintiff's inability to effectively teach the students at SUNY IT.

### 7. President Spina's Decision

In a letter dated December 11, 2006, Dr. Spina informed Plaintiff that his "term appointment" as Assistant Professor of Finance at SUNYIT would be terminated on August 31, 2007. Dr. Spina's decision not to renew Plaintiff's contract was based in large part on the recommendation of Dr. Mullick. Dr. Spina also heavily relied upon the recommendation from Dean Havlovic, who eventually removed Plaintiff from teaching in his final semester, replacing him with another professor.

### 8. SUNY IT's Discrimination Complaint Procedure

SUNY IT has a Discrimination Complaint Procedure that was in place prior to, and during, Plaintiff's entire term of employment with SUNY IT. The procedure is available to all SUNY IT students, employees and to the public on the school's web page. The procedure "provides a mechanism through which the University may identify, respond to, and prevent incidents of illegal discrimination." The procedure requires employees to "file a written complaint with the affirmative action officer within 90 calendar days following the alleged discriminatory act or the date on which the complainant first knew or reasonably should have known of such act."

**\*6** SUNY IT also has a faculty handbook, which is available through the college's website. The handbook also states how to file a complaint based on discrimination.

While at SUNYIT, Plaintiff had access to the Discrimination Complaint Procedure. In addition, Plaintiff had access to the faculty handbook. However, throughout his employment at SUNY IT, Plaintiff never filed any formal complaints regarding discrimination or any other matter. The only time Plaintiff discussed any concern with Mr. Panebianco was after the car ride with Dr. Langdon, and Plaintiff never went back to Mr. Panebianco's office to follow up on the one conversation they had.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

### C. Defendants' Motion

Generally, in support of their motion for summary judgment, Defendants argue, *inter alia,* as follows: (1) Plaintiff's claim of discrimination based on race and/or national origin should be dismissed because the record shows that Plaintiff's national origin or race was not a factor that motivated Defendants' employment actions; (2) Plaintiff's claim of hostile work environment based on race and/or national origin should be dismissed because the record shows that Plaintiff never formally complained of a hostile work environment, and one isolated incident does not establish a hostile work environment; (3) Plaintiff's claim of retaliation based on race and/or national origin should be dismissed because the record shows that Plaintiff's national origin and/or race was not a factor that motivated Defendants' employment actions; (4) Plaintiff's discrimination and retaliation claims should be dismissed, in the alternative, because SUNY IT had a discrimination policy in effect that was available to all faculty at the time Plaintiff was allegedly discriminated against, and Plaintiff unreasonably failed to follow that policy; and (5) Plaintiff's request for compensatory damages, back pay, or front pay should be dismissed, in the alternative, pursuant to the "after-acquired evidence doctrine" because the record shows that, had Defendants been aware of Plaintiff's poor teaching ratings at Bloomsburg University during the hiring process, Plaintiff never would have been offered employment. (*See generally* Dkt. No. 70, Attach. 1 [Defs.' Memo. of Law].)

In response to Defendants' motion for summary judgment, Plaintiff argues, *inter alia,* as follows: (1) his claim of discrimination based on race and/or national origin should not be dismissed because he has (a) established a prima facie case of discrimination, and (b) adduced record evidence from which a rational factfinder could conclude that Defendants' purported nondiscriminatory reason for not renewing his employment contract is pretextual; (2) his claim of retaliation based on race and/or national origin should not be dismissed because he has (a) established a prima facie case of retaliation, and (b) adduced record evidence from which a rational factfinder could conclude that Defendants' purported non-discriminatory reason for not renewing his employment contract is pretextual; and (3) Defendants arguments that they are entitled to a "same actor" presumption, and that the "after acquired evidence" and *Farragher Ellert* defenses apply, are without

merit. (*See generally* Dkt. No. 78, Attach. 5 [Plf.'s Reply Memo. of Law].)

**\*7** In reply to Plaintiff's response, Defendants (in addition to reiterating previously advanced arguments) argue, *inter alia,* that the Court should disregard the several qualifying statements provided by Plaintiff in his Rule 7.1 Response. (*See generally* Dkt. No. 82 [Defs.' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

Again, because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties. (Dkt. No. 70, Attach. 1 [Defs.' Memo. of Law]; Dkt. No. 78, Attach. 5 [Plf.'s Reply Memo. of Law]; Dkt. No. 82 [Defs.' Reply Memo. of Law].)

## III. ANALYSIS

### A. Plaintiff's Claim of National Origin and/or Racial Discrimination Under Title VII, Section 1981, and the NYHRL [1]

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's discrimination claim because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that the non-renewal of his employment contract was

discriminatory. Based on the current record, the Court agrees with Defendants.

Claims of national origin and/or racial discrimination are governed by the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "Under the burden-shifting rules set forth in *McDonnell Douglas* ..., a plaintiff has the initial burden of making out a prima facie case of discrimination." *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). For purposes of a Title VII disparate treatment claim, a plaintiff may do so by demonstrating "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004) (citing *Collins v. New York City Transit Auth.,* 305 F.3d 113, 118 [2d Cir.2002] ). The plaintiff's burden of establishing a prima facie case for discrimination "is not onerous .... [but] serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**\*8** "If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination." *Farias,* 259 F.3d at 98. "The defendant is not required to prove that the articulated reason actually motivated its actions." *Id.* "If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested)." *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000).

"If the defendant bears its burden of production, the presumption drops out of the analysis ... and the defendant 'will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.' " *Farias,* 259 F.3d at 98 (quoting *James,* 233 F.3d at 154). "Evidence that the defendant's articulated nondiscriminatory reason is false, when added to the prima facie case, may or may not be 'sufficient to support a reasonable inference

that prohibited discrimination occurred' and warrant submitting the case to the jury." *Id.* (quoting *James,* 233 F.3d at 156).

Here, with regard to the first and third above-described prongs, it is undisputed that (1) Plaintiff is a member of a protected class, and (2) his employment contract was not renewed. [2]

As for the second prong, Plaintiff has adduced record evidence from which a rational factfinder could conclude that he was qualified for the position he held. In fact, Defendants hired Plaintiff, who previously taught at a different University, instead of other applicants; and Dean Havlovic endorsed Plaintiff's hiring.

As for the fourth prong, even when viewing the facts in the light most favorable to Plaintiff, based on the admissible evidence in the record, a rational factfinder could not conclude that the non-renewal of Plaintiff's employment contract occurred under circumstances giving rise to an inference of unlawful discrimination. At best, the record establishes that Defendant Langdon had a conflict with Plaintiff, and that, as a result of this conflict, he voted against recommending Plaintiff for renewal and attempted to influence other faculty members to do the same. However, even viewing the evidence in the record in a light most favorable to Plaintiff, there is no evidence from which a rational factfinder could conclude that this conflict was based on Plaintiff's national origin and/or race. This is because the only evidence in the record regarding Defendant Langdon and Plaintiff's national origin and/or race is as follows: (1) a declaration from Plaintiff that Defendant Langdon made general comments about fearing people of Chinese descent and China being a "Third World Country" in Plaintiff's presence (Dkt. No. 78, Attach. 3, at ¶ 4); (2) testimony from Plaintiff that Defendant Langdon told him that he could not speak to students in the same manner as Tom Alee, an American-born professor, because Plaintiff is Chinese (Dkt. No. 69, Attach. 14, at 151); and (3) testimony from Plaintiff that Defendant Langdon previously "intimidated" two Asian faculty members (Dkt. No. 69, Attach. 14, at 179).

**\*9** With regard to Plaintiff's declaration about Defendant Langdon's general comments regarding China and Chinese people, those comments are vague, without context, and insufficient to establish animus toward

Plaintiff. With regard to Plaintiff's testimony that Defendant Langdon "intimidated" two other Asian faculty members, that testimony was both vague and based on hearsay. Finally, with regard to Plaintiff's testimony that Defendant Langdon made a statement about an American-born professor being able to "say" things to his students that Plaintiff cannot "say," it was at best ambiguous, and at worst evidence that Plaintiff pronounces words other than those he intends to pronounce. (*See also* Dkt. No. 69, Attach. 15, at 152 [pronouncing the word "eagle" but intending to say the word "ego"]; Dkt. No. 69, Attach. 15, at 152–54 [pronouncing the word "brown" but intending to say the word "bound"].)

In any event, even assuming, for the sake of argument, that Plaintiff has adduced record evidence from which a rational factfinder could conclude that Defendant Langdon's conflict with Plaintiff was based on Plaintiff's national origin, and therefore that the non-renewal of Plaintiff's employment contract occurred under circumstances giving rise to an inference of unlawful discrimination, Defendants have articulated legitimate, nondiscriminatory reasons for not renewing Plaintiff's employment with SUNY IT. More specifically, Defendants have adduced admissible record evidence establishing that Plaintiff was not renewed because of his IDEA scores, student complaints, student evaluations, and the recommendations of the Peer Review Committee, Dean Havlovic, and Vice President Mullick. As a result, Plaintiff must point to evidence that reasonably supports a finding of prohibited discrimination.

In an effort to satisfy his burden of demonstrating that Defendants' reasons for non-renewal were pretextual, Plaintiff argues that the admissible record evidence establishes the following: (1) from the fall of 2005 through the spring of 2006, only three student complaints were filed against Plaintiff; (2) two of these complaints were solicited by Defendant Langdon; (3) none of these student complaints were presented to Plaintiff, as required by SUNY IT's applicable grievance procedure or departmental policy (which suggests that the complaints were not taken seriously); (4) in late June and early July 2006, Defendants Langdon and Havlovic each told him that he did not need to worry about the prior student complaints, which were "closed issues"; (5) only one complaint was filed by a student against Plaintiff after he was told not to worry, which was based on

Plaintiff's accent, and was filed after the drop deadline as a justification for seeking late withdrawal; and (6) the student evaluations of Plaintiff were "better" than the student evaluations of a comparator whose contract was renewed.

As an initial matter, as stated above, even assuming that the record establishes that a conflict existed between Plaintiff and Defendant Langdon, a rational factfinder could not conclude, based on the admissible evidence in the record, that Defendant Langdon's conflict with Plaintiff was based on Plaintiff's national origin and/or race.

 **\*10** Moreover, even assuming that Defendant Langdon's conflict with Plaintiff was based on Plaintiff's nationality and/or race, contrary to Plaintiff's argument, the admissible evidence in the record does not establish that any student complaints were solicited by Defendant Langdon. Rather, the admissible evidence in the record establishes that students complained to Defendant Langdon on more than one occasion about Plaintiff's teaching, and, in response to those complaints, Defendant Langdon told the students to draft a petition and submit it to the Dean of the School of Business. (Dkt. No. 69, Attach. 7, at 11–14.)

In addition, the fact that Plaintiff was not informed of student complaints in accordance with school policy, and was told not to worry about the complaints filed in the spring of 2006 when he was made aware of them, is not evidence that a subsequent decision not to renew Plaintiff's contract was motivated by Plaintiff's national origin and/or race. This is especially true because Plaintiff does not dispute that additional student complaints were filed after he was allegedly told not to worry about the complaints filed in the spring of 2006.

Furthermore, the evidence in the record establishes as follows: (1) Plaintiff's IDEA scores were not great; (2) professors on the Peer Review Committee other than Defendant Langdon expressed concerns about Plaintiff's teaching; (3) the individual who endorsed Plaintiff's hiring recommended that Plaintiff's contract not be renewed; (4) the individual who hired Plaintiff decided not to renew Plaintiff's employment contract; (5) SUNY IT employs full-time faculty members of Asian and Chinese descent;[3] and (6) while he was a teacher at Bloomberg University, he received negative evaluations about his teaching from

several students, as well as complaints about his English, and the Dean of the College of Business stated in his final performance evaluation that one of his "concerns" was "the significant number of ratings in the C and D categories on [Plaintiff's] student evaluations."[4]

In other words, there is admissible evidence in the record that supports the decision not to renew Plaintiff's contract independent of (and uninfluenced by) Defendant Langdon. In addition, there is no admissible evidence in the record that the student complaints and/or concerns expressed by faculty members other than Defendant Langdon were in any way related to Plaintiff's national origin. Furthermore, finding a lack of discriminatory motive is supported by the above-described "same actor evidence," the fact that SUNY IT employs people of the same ethnic descent as Plaintiff, and the fact that the concerns expressed by Defendant Langdon, other faculty members, and students were shared by faculty members and students at Bloomberg University.[5] Simply put, Plaintiff has failed to point to any admissible record evidence from which a rational factfinder could find prohibited discrimination.

 **\*11** As a result, Plaintiff's discrimination claim is dismissed.

### B. Plaintiff's Claim of Hostile Work Environment Based on His Race and/or National Origin Under Title VII, 42 U.S.C. § 1981 and the NHHRL[6]

Defendants argue that, to the extent Plaintiff's Amended Complaint may be construed as asserting a claim of a hostile work environment, that claim should be dismissed because a single incident is insufficient as a matter of law to constitute a hostile work environment. Essentially, Defendants argue that, because Plaintiff has adduced record evidence of only one incident of harassment, Plaintiff's hostile work environment claim must be dismissed. Defendants further argue that, even if his work environment was hostile, Plaintiff's failure to formally complain about the incident of harassment, as required by the employee handbook, is fatal to his hostile-work-environment claim.

In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff does not address Defendants' challenge to his claim of a hostile work environment. For this reason, Defendants' burden, with

regard to their request for dismissal of that claim, is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a "modest" burden. [7] After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only two points.

First, the Court does liberally construe Plaintiff's Amended Complaint as asserting a claim of a hostile work environment. (*See, e.g.,* Dkt. No. 28, ¶¶ 13– 14, 15, 16 ["During the course of his employment by SUNY IT, defendants subjected plaintiff to a hostile work environment, which caused plaintiff great emotional distress and adversely affected plaintiff's ability to do his job.... Plaintiff was subjected to the hostile work because of his nationality and race.... The hostile environment included harassing and intimidating conduct by defendant Langdon."].)

Second, under the circumstances, the single incident involving Plaintiff riding in a car with Dr. Langdon, which did not involve a physical assault or any other "extraordinarily severe" conduct, such as intimidating verbal harassment, and which did not deter Plaintiff from teaching the following semester and seeking employment renewal, does not establish a hostile work environment as a matter of law. [8]

As a result, Plaintiff's hostile-work-environment claim is dismissed.

### C. Plaintiff's Claim of Retaliation Based on His Race and/ or National Origin Under Title VII, Section 1981 and the NYHRL

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's retaliation claim because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that his non-renewal was retaliatory. Based on the current record, the Court accepts Defendants' argument.

**\*12** "To make out a prima facie case of retaliation, under Title VII, Section 1981 and NYSHRL, a plaintiff must show [the following]: (1) participation in a protected activity known to Defendants; (2) an adverse employment action; and (3) a causal connection between the two."

*Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 341 (S.D.N.Y.2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz,* 202 F.3d at 566 (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Sumner,* 899 F.2d at 209.

Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya,* 202 F.3d at 640 (2d Cir.2000); *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at *4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered."). [9]

A plaintiff may establish a casual connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield,* 663 F.Supp.2d at 343 (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 [S.D.N.Y.2004] ).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees

not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 [E.D.N.Y.2003] ).

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

**\*13** "Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343. "If the ... defendant ... points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. Gen. El. Co.,* 252 F.3d 205, 216 (2d Cir.2001).

Here, Plaintiff argues that complaining to Dean Havlovic and Anthony Panebianco, Associate Vice President of Human Resources, about Defendant Langdon taking him for a car ride constitutes engagement in protected activity. Plaintiff further argues that he has established a casual connection between this protected activity and the adverse action that he suffered.

As an initial matter, the Court rejects Plaintiff's argument that his complaint constitutes protected activity. Although Plaintiff testified (vaguely) that he "report[ed] to Dr. Havlovic [Defendant Langdon's] behavior of coercion, harassment and discrimination," and "mentioned the pattern of what [Defendant Langdon] did to ... other Asian people," Plaintiff also testified that he did not expressly use the word "discrimination," mention his national origin, or indicate that he felt Defendant Langdon was treating him with discriminatory animus. (Dkt. No. 69, Attach. 14, at 175–80.) Rather, Plaintiff essentially told Dean Havlovic and Anthony

Panebianco that, during a car ride, Defendant Langdon "demanded" or attempted to "coerce" Plaintiff into assisting him with a publication. (*Id.*) In other words, a rational factfinder could not conclude, based on Plaintiff's vague testimony about "other Asian people," that Plaintiff accused Defendant Langdon of subjecting him to discrimination on the basis of his national origin and/or race during the car ride. (*Id.*)

In addition, even assuming, for the sake of argument, that Plaintiff's complaint can be deemed to have been a protest against discrimination (such that Plaintiff has established a prima facie case of retaliation), [10] as stated above in Part III.A. of this Decision and Order, Defendants have articulated legitimate, nondiscriminatory reasons for non-renewal. More specifically, Defendants have adduced admissible record evidence establishing that Plaintiff was not renewed because of his IDEA scores, student complaints, student evaluations, and the recommendations of the Peer Review Committee, Dean Havlovic, and Vice President Mullick. As a result, Plaintiff must point to evidence that reasonably supports a finding of prohibited discrimination.

In an effort to satisfy his burden of demonstrating that Defendants' reasons for not renewing him were pretextual, Plaintiff restates the arguments that he advanced regarding his discrimination claim. This Court has already rejected these arguments. *See, supra,* Part III.A. of this Decision and Order.

**\*14** As a result, Plaintiff's retaliation claim is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED;** and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 28) is **DISMISSED.** The clerk of the Court is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4344025

Footnotes

1    "Courts require the same standards and burdens of proof for claims brought under Title VII, § 1981, and the NYHRL."
     *Ayton v. Lenox Hill Hosp.,* 93–CV–6601, 1997 WL 10000, at *1 n. 1 (S.D.N.Y. Jan.9, 1997) (collecting cases).

2    The Court agrees with Plaintiff that "non-renewal of an employment contract constitutes an adverse employment action
     for purposes of Title VII." *Liebowitz v. Cornell Univ.,* 584 F.3d 487, 500–501 (2d Cir.2009).

3    (Dkt. No. 69, Attach. 15, at 2.)

4    (Dkt. No. 69, Attach. 14, at 35, 41–42, 47–50, 53–54.)

5    *See* *Rolle v. Worth Cnty. Sch. Dist.,* 128 F. App'x 731, 733 (11th Cir. Apr.19, 2005) ("Reviewing the evidence, the
     only possible evidence of motive relates to a single Board member, but an improper motive of one member does not
     impart discrimination on the entire Board.... Additionally, the fact that the Board hired other minorities negates any
     showing of pretext."); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997) ("[W]hen the person who made
     the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an
     invidious motivation that would be inconsistent with the decision to hire."); *Alexander v. Gerhardt Enter., Inc.,* 40 F.3d
     187, 196 (7th Cir.1994) (finding that "evidence that [plaintiff] had encountered employment difficulties with previous
     employers" supported conclusion that defendant had offered legitimate, nondiscriminatory reason for plaintiff's discharge,
     but affirming "district court's implicit finding that [defendant]'s proffered reasons were pretextual and that its actual reasons
     were retaliatory"); *cf.* *Cutshall v. Potter,* 347 F.Supp.2d 228, 237 (W.D.N.C.2004) ("[T]he fact that an employer offered a
     promotion to a member of one race creates a powerful inference that the failure to offer the same promotion to another
     employee of the same race was not motivated by race discrimination.").

6    "Hostile work environment claims under Title VII, § 1981[and] NYSHRL ... are ... analyzed using the same standard."
     *Jean–Louis v. Am. Airlines,* 08–CV–3898, 2010 WL 3023943, at *9 n .12 (E.D.N.Y. July 30, 2010).

7    *See* *Rescuecom Corp. v. Chumley,* 07–CV–0690, 2011 WL 2791272, at *3 & n. 4 (N.D.N.Y. July 14, 2011) (Suddaby,
     J.) (collecting authorities); *cf.* *Frink Am., Inc. v. Champion Road Mach. Ltd.,* 48 F.Supp.2d 198, 209 (N.D.N.Y.1999)
     ("Plaintiff does not address these claims in its opposition papers, leading the Court to conclude that it has abandoned
     them.") (McAvoy, J.); *Singleton v. City of Newburgh,* 1 F.Supp.2d 306, 312 (S.D.N.Y.1998) (deeming plaintiff's claim
     "abandoned" and granting defendants' motion for summary judgment where claim was alleged in the complaint but "not
     raised elsewhere in the record"); *Nat'l Commc'n Ass'n, Inc. v. Am. Tel. & Tel. Co.,* 92–CV–1735, 1998 WL 118174, at *28
     (S.D.N.Y. Mar.16, 1998) (plaintiff's claim deemed "abandoned" and defendant granted summary judgment where plaintiff
     did not address claim in response to defendant's summary judgment motion); *Anti–Monopoly, Inc. v. Hasbro, Inc.,* 958
     F.Supp. 895, 907 n. 11 (S.D.N.Y.1997) ( "[T]he failure to provide argument on a point at issue constitutes abandonment
     of the issue."), *aff'd,* 130 F.3d 1101 (2d Cir.1997).

8    *See, e.g.,* *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175, 183–85 (W.D.N.Y.2010) (holding that female deputy sheriff
     jailor was not subjected to gender based hostile work environment under Title VII or New York State Human Rights
     Law based on single incident of being subjected to graphic live sex in the workplace); *Kennedy v. J.P. Morgan Chase
     & Co.,* 325 F.Supp.2d 401, 409 (S.D.N.Y.2004) (finding that single incident of vice-president of company, entering
     African–American employee's work area, dressed in a "robber baron" costume with a top hat and cane, approaching
     employee's desk, and slamming his cane repeatedly on the floor, loudly questioning the presence of "black people" within
     the company, was not sufficiently severe to support employee's hostile work environment claim); *Samuels v. New York
     State Dep't of Corr. Servs.,* 94–CV–8645, 1997 WL 253209, at *7 (S.D.N.Y. May 14, 1997) (granting summary judgment,
     dismissing claim that a single incident of defendant poking plaintiff in the breast created a hostile work environment); *cf.*
     *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 230 (2d Cir.2004) (finding that "[a]lthough a single incident ordinarily will not
     give rise to a cognizable claim for hostile work environment, [an] alleged event [that] included not only racial remarks but
     also a physical assault" created a question of fact for the factfinder).

9    *Cf.* *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 501 (2d Cir.2009) ("An employee seeking a renewal of an employment
     contract, just like a new applicant or a rehire after a layoff, suffers an adverse employment action when an employment
     opportunity is denied and is protected from discrimination in connection with such decisions under Title VII and the
     ADEA.").

10   It is undisputed that Defendant Langdon decided not to recommend Plaintiff for renewal within a close time period to him
     learning about Plaintiff's complaint.